UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| DWYER INSTRUMENTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 3:09-CV-10-TLS |
| | ) | |
| SENSOCON, INC., and TONY E. KOHL, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

The Plaintiff, Dwyer Instruments, Inc. (Dwyer), has sued the Defendants, Sensocon, Inc. (Sensocon), and its owner and operator, Tony Kohl (Kohl) (collectively the Defendants), for trademark infringement, trade dress infringement, counterfeiting, unfair competition, false designation of origin, and copyright infringement. One of Dwyer's allegation is that Kohl, a former Dwyer employee, improperly applied the distinctive and trademark-protected pattern of Dwyer's pressure gauge lens covers to Sensocon brand pressure gauges.

The parties have filed cross motions for partial summary judgment. In a Motion to Strike [ECF No. 117], the Defendants request that the Court strike the Amended Report of James T. Berger (Berger Report), which the Plaintiff introduced in support of its response to the Defendants' Motion for Partial Summary Judgment. Specifically, the Plaintiff designated Berger's Report to support its assertion that whether Sensocon's latest version of its product (referred to by the parties as the third generation lens) infringes on the Plaintiff's trademark rights is an issue in this suit despite the third generation lens not being specifically identified in the First Amended Complaint. The Defendants move to strike Berger's Report on grounds that it is not authenticated by sworn testimony and fails to meet the standard for expert testimony required under *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579 (1993), and Rule

702. The Plaintiff responded to this motion to strike [ECF No. 120], and the Defendants replied [ECF No. 122]. Embedded in the Defendants' Reply in Support of Motion to Strike [ECF No. 122] is a request that, if the Court accepts the Berger Report, the Court grant the Defendants an opportunity to present the Rebuttal Report of Michael B. Mazis, Ph.D.

**STANDARD OF REVIEW**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert* and its progeny. *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). For expert testimony to be admissible, it must be relevant and reliable, as required by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert*, the Supreme Court stated that Rule 702 required the district court to perform a "gatekeeping responsibility" in admitting expert scientific testimony, to ensure that it is "not only relevant, but reliable." 509 U.S. at 589 & n.7. The purpose of the rule in *Daubert* "was to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).

*Daubert* listed four factors to be considered when determining whether scientific evidence is reliable: 1) whether the theory or technique can be or has been tested; 2) whether the

2

theory or technique has been subjected to peer review and publication; 3) whether there are standards controlling the technique's operation and its known or potential rate of error; and 4) whether the theory or technique has gained widespread acceptance in the relevant scientific community. 509 U.S. at 593–94. The focus is solely on principles and methodology, not on the conclusions that they generate. *Id.* at 594–95.

*Daubert's* general principles apply to the expert matters described in Rule 702, not only to those matters that contain scientific testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999). Courts must determine if the expert is qualified in the relevant field and if the methodology underlying the expert's conclusion is reliable. *Ammons v. Aramarck Unif. Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004). "Surveys are . . . routinely admitted in trademark and false advertising cases to show actual confusion, genericness of a name or secondary meaning, all of which depend on establishing that certain associations have been drawn in the public mind." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 225 (2d Cir. 1999); *see also Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1038 (S.D. Ind. 2000) ("Consumer surveys are generally accepted by courts as one means of showing the likelihood of consumer confusion."). The Seventh Circuit has held that survey evidence must comply with principles of professional survey research to be admissible. *Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 776 (7th Cir. 2007). The Seventh Circuit has also stated that "[w]hile there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, . . . such situations will be rare." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) (holding that "any shortcomings in the survey results go to the proper weight of the survey and should be evaluated by the trier of fact"). In fact, courts often

recognize that criticisms of surveys used in litigation "are appropriate topics of cross-examination and contrary evidence to reduce the weight of the survey without requiring that . . . it be excluded." *Simon Prop.*, 104 F. Supp. 2d at 1039 (citing *Indianapolis Colts, Inc. v. Metro. Balt. Football Club L.P.*, 34 F.3d 410, 416 (7th Cir. 1994); *AHP Subsidiary*, 1 F.3d at 618; *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1172 (7th Cir. 1986); *Henri's Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352, 357 (7th Cir. 1983)).

## APPLICATION OF STANDARD TO BERGER'S REPORT

The Plaintiff retained James T. Berger to conduct a survey related to the likelihood of consumer confusion between its product and the Defendants' product. Berger explains in his Report that he conducted an Internet research study "to determine whether a relevant sample of consumers who purchase differential pressure gauge products or who intend to purchase differential pressure gauge products are able to identify and differentiate whether assorted differential pressure gauge products emanate from the same or different sources." (Am. Berger Report 2, ECF No. 120-1 at 5.) His conclusion, based on the survey results, is that "Sensocon is trading on the trade dress of Dwyer's product (Magnehelic) and is causing a likelihood of confusion in the marketplace." (*Id.* 12.)

Berger designed an internet survey that was conducted by a general contractor with the assistance of a consumer panel vendor. A screening portion of the survey required that participants meet certain qualifications, including having purchased a differential pressure gauge product within the last three years or intending to purchase the product in the next twelve months. The participants were presented with a five-product array that included the names of the

products; Wika; Airflow; Ashcroft; Magnehelic (Dwyer); and Sensocon. The products were further identified by letters A, B, C, D, and E, the order of which varied throughout the survey. The survey contained four key questions:

> Which, if any, of these products do you believe are put out by the same company? Please mark the letters below. <u>If you don't know, feel free to mark "don't know."</u>
>
> Which, if any, of these products do you believe are produced by companies that are associated with one another? Please mark the letters below. <u>If you don't know, feel free to mark "don't know."</u>
>
> Which, if any, of these products do you believe are produced by companies that are affiliated with one another? Please mark the letters below. <u>If you don't know, feel free to mark "don't know."</u>
>
> Which, if any, of these products do you believe are produced by companies that are sponsored by one another? Please mark the letters below. <u>If you don't know, feel free to mark "don't know."</u>
>
> Which, if any, of these products do you believe are produced by companies that are owned by one another? Please mark the letters below. <u>If you don't know, feel free to mark "don't know."</u>

(Am. Berger Report 9.) Two separate surveys were conducted: one involving Sensocon's original lens and the second involving Sensocon's third generation lens.

The Defendants' Motion asserts that the methodology Berger used while conducting market research was unreliable. First, the Defendants argue that the survey does not provide a basis for confirming that the respondents to the survey were actual purchasers of pressure gauges because only a small percentage of respondents were contacted to validate their response to this qualification, and some of them admitted that they did not meet the criteria. The Defendants also argue that Berger's Report lists the rates of correlation between the Dwyer and Sensocon products, "but fails to include any rates at which the other gauges studied were comparably correlated. Accordingly, the study lacks any indication that there were controls in place and

5

provides no basis for concluding that the Sensocon gauge was perceived with any measurable difference by the survey respondents." (Mot. to Strike 5, ECF No.117.) Third, the Defendants characterize the survey question phrase, "Which, if any, of these products do you believe . . . ?" as patently biased and leading. Finally, the Defendants assert that the Report lacks any indication that the survey was conducted as a double-blind study.

A.     **The Universe of Respondents and Post-Validation**

The probative value of a survey depends in large part upon the "universe" of respondents, and the reliability of the survey is diminished if the universe of desired respondents is erroneous or undefined. *See Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487–88 (5th Cir. 2004) (a valid survey must interview individuals who "adequately represent the opinions which are relevant to the litigation"). The legal inquiry as to whether an allegedly infringing product has caused consumer confusion "centers on the confusion of consumers in the market for the particular products at issue." *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 382 (7th Cir. 1996).

The Defendants do not claim that the identified universe was erroneous or inadequate to represent the opinions that are relevant to this litigation, but argue that there was insufficient confirmation that the respondents to the survey actually fell within the parameters of the universe. Thus, this challenge appears to go to the validation process. The validating process of the Internet study was conducted by Suburban Marketing Research. The survey involved 409 participants. Suburban indicated that it attempted to contact the 128 participants in the survey who included contact information. Suburban asked the participants it reached if they had recently

participated in an online study about differential pressure gauges, if they were at least 18 years of age, if they had purchased, or expected to purchase a differential pressure gauge, and if they viewed pictures of pressure gauges online as part of the study. Of those contacted, 51 people validated correctly, 11 had not purchased a pressure gauge and did not expect to, and 4 persons said they did not take the survey. The 11 who were not part of the universe were eliminated from the study and replaced, and the study was re-tabulated. (Am. Berger Report 2.) An additional 8 contact numbers were disconnected, 1 was a facsimile number, and 6 resulted in "No Such Person" at the given number. The balance of the phone numbers went to answering machines or voice mail boxes. Suburban concluded that it was "satisfied that the survey was administered correctly." (Ex. D to Am. Berger Report.)

Berger asserts that, based on his more than ten years of experience developing surveys like the one at issue here and testifying as an expert with respect to intellectual property surveys, validating 10–15% of the respondents in an Internet survey is common and accepted as providing proper validation. Berger also stated that because the main reason to validate a survey is to verify that participants actually took it, there is really no need to verify Internet surveys because "someone had to be sitting at the computer entering answers to the survey questions." (Berger Decl. ¶ 8, ECF No. 120-1.) Berger does not address the aspect of the validation process concerned with whether respondents sitting at the computer were actually part of the identified universe, a concern that would not be alleviated by an Internet survey. Although Berger re-tabulated the survey results after excluding the eleven known respondents who did not meet the screening criteria, his Report does not address the potential that some of the other respondents—who were not contacted—also fall outside the relevant universe. However, even if

7

professional survey principles would require greater assurance that the participants were consumers in the differential gauge market, such a deficiency would not render the survey or Berger's Report inadmissible. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997) ("Technical unreliability goes to the weight accorded to a survey, not its admissibility.") (quoting *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992)); *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980) ("In evaluating survey evidence, technical deficiencies go to the weight to be accorded them, rather than to their admissibility."); *see also Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 930–31 (7th Cir. 1984) (where the defendant objected to the universe used for a survey, the court held that the problems with the universe impacted the probative value on the issue of confusion and went "to the weight to be given the survey results, not the admissibility of the survey"). Here, whether the survey and the corresponding Report are sufficient, in connection with the other evidence presented on summary judgment, to find that a material issue of fact remains for trial is a separate analysis from admissibility.

**B.     Use of Filter Questions**

Some respondents to a survey will not have an opinion on a question asked, which can result in a respondent guessing as to the "right" answer. Reliable surveys address this issue through the use of filter questions and "don't know" or "no opinion" answer alternatives. *See, e.g., LG Elecs. USA, Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 954–55 (N.D. Ill. 2009) (finding that a survey's inclusion of a "don't know" option as an answer to an otherwise close-ended question was sufficient to mitigate concerns about its reliability). Here, the survey

8

complies with this standard by providing a "don't know" option. In addition, for each question at least 50% of the respondents exercised the option to answer "don't know." The Defendants do not explain how the use of the phrase "Which, if any," in conjunction with the option to answer "don't know" is "patently biased and leading." The Court does not find that the wording of the survey contravenes the principles of professional survey research.

**C.     Double-Blind Survey**

The objectivity of surveys is ensured through double-blind research methodology whenever possible. *See Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 590–91 (3d Cir. 2002) (upholding the district court's reliance on a survey "during which both the respondents and the interviewers [were] unaware of the purpose of the survey or its sponsor.") The Defendants argue that Berger's methodology is unreliable because the survey was not double-blind. The evidence does not support this conclusion. In Berger's Declaration, he states that the survey participants did not know the purpose of the survey or the sponsor of the survey. Additionally, although he developed and designed the survey, a separate entity administered the survey and another developed the random sample of participants. Neither of these entities, which are identified in the Report, knew the purpose or sponsor of the survey, thus creating a double-blind survey. This factor supports the reliability of the survey.

### D. Rates of Correlation

The Defendants criticize Berger's Report as listing only the rates of correlation between the Dwyer and Sensocon products and not including the other products that the survey participants viewed. The Defendants argue that this shows that the study contains no indication that there were controls in place. The Court does not follow the logic of this argument, as the inclusion of additional images of non-Dwyer and non-Sensocon differential pressure gauges in the survey was a control. The Defendants' argument appears to be challenging Berger's reporting of the survey rather than the survey itself. The Report however, to be helpful to the trier of fact, must be relevant to the issue in dispute. Berger tabulated the number of respondents that singled out only the Dwyer and Sensocon gauges and included these numbers in his Report. Because no other combination of responses was selected at the rate the combination of Dwyer and Sensocon products were selected, this was the relevant data to include in the Report. If the Defendants disagree, they are free to cross examine Berger on this point. The Defendants do not explain how excluding the other data in the Report renders it or Berger's opinion inadmissible.

The survey complies with generally-accepted principles of survey research and Berger's Report satisfies the requirements of Rule 702. Whether the Report adequately supports the factual assertions contained in the Plaintiff's Statements of Genuine Disputes and Additional Material Facts [ECF No. 108-1] or creates a genuine issue of material fact is a separate matter—one that is not resolved by this Opinion and Order.

## AUTHENTICATION

In addition to challenging Berger's methods, the Defendants argue that the Court should

not consider Berger's Report because it has not been authenticated by sworn testimony. *See Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003) (holding that a report introduced into the record without any supporting affidavit verifying its authenticity was inadmissible and could not be considered for purposes of summary judgment). However, the Court has discretion, pursuant to Federal Rule of Civil Procedure 56(e)(1), to give a party an opportunity to properly support or address a fact that was not properly supported. In its Memorandum in Opposition to the Motion to Strike, the Plaintiff submitted the Declaration of James T. Berger in which he explains the process of developing the survey and tabulating the results and identifies the Report and other related documents. Berger's Declaration is sufficient to support a finding that the Report is what the Plaintiff claims. *See* Fed. R. Evid. 901(a). The Court exercises its discretion to accept Berger's Declaration and finds that the Report has been properly authenticated.

**HEARSAY**

In their Reply brief in support of striking Berger's Report, the Defendants assert that the Report contains inadmissible hearsay. The Defendants do not develop this argument and the Court finds it to be without merit. The Seventh Circuit has stated that survey results are not hearsay:

> In fact, the commentators unanimously agree that survey results are not inadmissible hearsay; rather, the results are reports of the state of mind of the interviewees, Fed. R. Evid. 803(3), and form the basis for the opinion of an expert witness from which the expert testifies as to the likelihood of confusion, Fed. R. Evid. 703.

*Piper Aircraft*, 741 F.2d at 931 (citing various trademark law commentators and *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 553 (7th Cir. 1980)); *see also Schering Corp.*, 189 F.3d at 226–27. In fact, the Advisory Committee Notes to the 1972 proposed Rule 703 stated that "[t]he

rule . . . offers a more satisfactory basis for ruling upon the admissibility of public opinion poll evidence. Attention is directed to the validity of the techniques employed rather than to relatively fruitless inquires whether hearsay is involved." Rule 703 Notes of Advisory Committee on Proposed Rules, 1972 Proposed Rules. The Court will not strike Berger's Report on hearsay grounds.

**CONCLUSION**

For the reasons stated above, the Court DENIES the Defendants' Motion to Strike [ECF No. 117]. To give the Defendants an opportunity to address the Plaintiff's assertions of fact that are designated by citations to Berger's Report, the Court GRANTS the Defendants, pursuant to Federal Rule of Civil Procedure 56(e)(4), until March 15, 2012 to submit the Rebuttal Report of Michael B. Mazis, Ph.D., and to provide a corresponding Supplemental Statement of Material Facts addressing claims with regard to Sensocon's third generation lens to the extent it is appropriate for resolution of the Defendants' Motion for Partial Summary Judgment.

SO ORDERED on February 21, 2012.

                                                          s/ Theresa L. Springmann
                                                        THERESA L. SPRINGMANN
                                                        UNITED STATES DISTRICT COURT
                                                        FORT WAYNE DIVISION