# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| DWYER INSTRUMENTS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  CAUSE NO.: 3:09-CV-10-TLS |
| | ) |
| SENSOCON, INC., and TONY E. KOHL, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

The Plaintiff, Dwyer Instruments, Inc. (Dwyer), has sued the Defendants, Sensocon, Inc. (Sensocon), and its owner and operator, Tony Kohl (Kohl) (collectively the Defendants), for trademark infringement, trade dress infringement, counterfeiting, unfair competition, false designation of origin, and copyright infringement. The Plaintiff has moved for partial summary judgment [ECF No. 97] on Count I of its First Amended Complaint, which asserts a claim for federal trademark infringement of United States Trademark Registration No. 3,397,050, and on the Defendants' affirmative defense that the "Plaintiff's claims are barred by the equitable defenses of laches, estoppel, acquiescence, and unclean hands," (Defs.' Revised Answer and Aff. Defenses 33, ECF No. 92). The Plaintiff alleges that Sensocon and Kohl, a former Dwyer employee, infringed on its trademark when they improperly applied the distinctive and trademark-protected pattern of Dwyer's pressure gauge lens covers to Sensocon brand pressure gauges.[1]

In response, the Defendants argue that genuine issues of material fact exist regarding

---

[1] In various places throughout the record in this case, gauges is sometimes spelled "gages" in connection with Dwyer's product. The Court will refer to the product at issue as a gauge, but will honor the gage spelling when quoting any part of the record containing that spelling.

whether the mark at issue is a protectable trademark and whether there was a likelihood of confusion between the Plaintiff's and Sensocon's products. The Defendants also assert that none of the actions they took before the mark was registered can constitute infringement and that Sensocon has not sold the gauge with the lens at issue since December 31, 2009. With respect to their affirmative defense, the Defendants contend that, because the Plaintiff delayed in pursuing its alleged rights, its claim is barred under the doctrine of laches. Although the Defendants assert that genuine issues of material fact exist whether Kohl was the alter ego of Sensocon, their brief in opposition to the Plaintiff's Motion for Partial Summary Judgment does not contain any argument on this issue. The Defendants have also filed a cross-motion for summary judgment on Count I of the First Amended Complaint [ECF No. 103], which repeats arguments with respect to the dates of possible infringement and asserts that the Court should enter summary judgment for the Defendants because the Plaintiff cannot recover any damages. The cross motion also adds argument with respect to Kohl's liability as an alter ego of Sensocon.

In connection with their Motion for Partial Summary Judgment, the Defendants have filed a Motion to Strike [ECF No. 114] directed at the Declaration of Eric Budny, who is a manager at Dwyer. The Defendants argue that various portions of Budny's Declaration do not comply with the requirements of Federal Rule of Civil Procedure 56(c)(4) because Budny lacks personal knowledge and makes legal conclusions. This Opinion and Order resolves whether summary judgment should be granted for any party on Count I of the First Amended Complaint. The Court will address the Motion to Strike directed at Budny's Declaration to the extent it is necessary to resolve the cross motions for partial summary judgment.

## STATEMENT OF FACTS

**A.     The Registered Mark**

The Plaintiff is a leading manufacturer in the instrumentation and controls industry. Among the products the Plaintiff sells are gauges that measure the differential pressure of air and compatible gases. The Plaintiff sells these gauges to original equipment manufacturers and end users, including those in industries that involve heating, ventilation and air conditioning, pollution control, chemicals, food, and oil and gas. Since 1962, the Plaintiff has been using a lens design on its gauges that incorporates a generally rounded side wall forming a generally domed face with an ornamental design on the lower portion of the lens face that consists of a plurality of horizontal lines and a raised rectangular portion. One of the Plaintiff's most successful and popular product lines, the Series 2000 Magnehelic® brand pressure gauges, feature this lens design. The Plaintiff uses the same lens on other products it manufactures including the Series 4000 Capsuhelic® brand pressure gauges and Series RMV Rate-Master® brand flow meters.

On November 8, 2006, the Plaintiff filed an application with the United States Patent and Trademark Office (USPTO) to register the lens design that it used on pressure gauges and differential pressure gauges. On March 19, 2007, the USPTO notified the Plaintiff that it was refusing registration "because the proposed mark consists of a nondistinctive configuration of the goods that does not function as a trademark to identify and distinguish applicant's goods from those of others and to indicate their source." (Mar. 19, 2007, USPTO Letter 2, ECF No. 113-1.) Citing to the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205 (2000), the USPTO invited the Plaintiff to submit evidence that its design had acquired

distinctiveness under 15 U.S.C. § 1052(f). The USPTO suggested that the Plaintiff submit examples of advertising and promotional materials that specifically promoted the proposed mark as a trademark, dollar figures for advertising devoted to such promotion, dealer and consumer statements of recognition of the proposed mark as a trademark, and any other evidence that established recognition of the matter as a mark for the goods.

On September 19, the Plaintiff submitted a response to the USPTO arguing that the materials submitted established that the mark had acquired distinctiveness based on the duration and exclusivity of the Plaintiff's use of the specific lens configuration, and based on advertising costs associated with gauges containing the lens configuration. On March 18, 2008, the USPTO issued United States Registration No. 3,397,050 to the Plaintiff under § 1052(f) for the mark (Lens Mark) in connection with pressure gauges and differential pressure gauges. The Lens Mark "consists of a plurality of horizontal lines and a raised rectangular portion on the lens of a pressure gauge." (Trademark, ECF No. 98-4.) The Lens Mark illustration from the registration is reproduced below:



By May 2008, the Plaintiff was using the ® symbol in connection with the lens design.

**B.      The Sensocon Products**

In 1997, Kohl began working for the Plaintiff, ultimately reaching the level of District Sales Manager. In his employment for the Plaintiff, Kohl promoted the sale of the Plaintiff's Magnehelic® brand pressure gauges. On July 20, 2005, Kohl resigned from the Plaintiff's employment, and within three weeks incorporated Sensocon. The following year, Kohl contacted a Chinese-based company seeking information on a product "that was identical to the Dwyer Magnehelic that was made by a company called Best Control Technology (in Beijing)." (Email correspondence, ECF No. 102.) Kohl indicated that he was interested in selling the product in North America. By summer 2006, a Chinese company, Sailsors, was manufacturing differential pressure gauges for Sensocon. In fall 2006, Kohl contacted current customers of the Plaintiff to let them know that Sensocon had an alternative to the pressure gauge they were currently using, specifically a Sensocon model S2000 differential pressure gauge. According to Kohl's deposition testimony, the Sensocon S2000 had a lens "substantially identical to the lens on the Dwyer Magnehelic gauge." (Kohl Dep. 41–42, ECF No. 100.) A former customer of the Plaintiff that began purchasing differential pressure gauges from Sensocon for private label also acknowledged that there was no visual difference between the Sensocon S2000 gauge and the Plaintiff's Magnehelic product. (Haakon Dep. 31, ECF No. 98-20.) The lens had the same plurality of horizontal lines and a raised rectangular portion. The face of the gauge, however, included the word SENSOCON, instead of Magnehelic®.

In later 2006, the Plaintiff became aware that Sensocon was marketing competitive pressure gauges that the Plaintiff believed incorporated its trademarks without authorization. On January 8, 2007, the Plaintiff sent the Defendants a letter with respect to Sensocon's use of the

Plaintiff's Magnehelic® and Dwyer® registered trademarks and Series 2000 common law

trademark in marketing and promotional materials. The letter also advised that the Plaintiff was

the owner of trademark rights in the trade dress of its Magnehelic® pressure gauges as generally

shown in an attached drawing, which showed a gauge with a plurality of horizontal lines

covering the bottom portion of the lens and a raised rectangular portion. The letter alleged that

the Sensocon S2000 differential pressure gauge incorporated the trade dress of the Plaintiff's

Magnehelic® pressure gauge, violated the Plaintiff's trademark rights, and was likely to cause

confusion, mistake, and deception of the purchasing public. The Plaintiffs requested a written

assurance by January 22, 2007, that the Defendants would cease and desist from the identified

activities and voluntarily discontinue use of the Plaintiff's marks and trade dress so that future

legal action would not be necessary. (Jan. 8, 2007, Letter, ECF No. 104-2.)

The Defendants continued to advertise, promote, and sell the S2000 Sensocon gauge

throughout 2008 and 2009.[2] On January 7, 2009, the Plaintiff filed its lawsuit against the

Defendants for trademark infringement, trade dress infringement, unfair competition, false

designation of origin, and copyright infringement. The Plaintiff later added a claim for

---

[2] The Defendants maintain that after December 31, 2009, Sensocon no longer sold the S2000 gauge, but instead sold a third generation gauge with a new design that did not contain a plurality of horizontal lines and raised rectangular portion. The Plaintiff's Motion for Partial Summary Judgment does not address this gauge or seek summary judgment with respect to this gauge, but seeks judgment that the Defendants original Series S2000 and Series P2000 brand pressure gauges incorporated the Plaintiff's Lens Mark. Although the Plaintiff refers to Sensocon's P2000 gauge, it does not provide any details concerning this gauge. The briefs also refer to the second generation of Sensocon gauges containing a plurality of horizontal lines and a raised rectangular portion. The Defendants maintain that they never sold this version of Sensocon lens. The Plaintiff submits that the Defendants have accepted orders on behalf of customers who saw advertising that featured the second generation lens design. Given the lack of clarity surrounding these other gauges, the Court will limit its ruling to whether Sensocon's first generation Series S2000 differential pressure gauge infringes on the Plaintiff's trademark in violation of 15 U.S.C. § 1114.

counterfeiting.

In 2010, Sensocon began selling gauges with a different lens design, which it referred to as its third generation lens. On November 8, 2010, Sensocon filed a Petition to Cancel U.S. Trademark Registration No. 3,397,050 with the USPTO.[3] Sensocon argued that the Lens Mark did not demonstrate distinctiveness because the features that formed the basis of the trademark were functional, and the evidence before the USPTO did not establish acquired distinctiveness. Sensocon argued that the plurality of lines is functional because it masks the mechanical workings of the pressure gauge and that the raised rectangular portion is functional because it provides a convenient location for the product's "'zero adjustment screw' to make accessible without the functional necessity of removing the entire lens cover of the pressure gauge, and to provide a functionally rectangular-shaped substrate upon which to place a correspondingly sized, rectangular-shaped, stick-on user cautionary label." (Pet. to Cancel 3, ECF No. 113-7.) On December 10, the Plaintiff filed a Motion to Suspend Proceedings Due to Prior Pending Civil Action in Federal District Court. The USPTO suspended its proceedings pending final disposition of this action, thus leaving the registration intact.

## ANALYSIS

The Plaintiff argues that it is entitled to judgment as a matter of law on Count I of its First Amended Complaint for federal trademark infringement of its Lens Mark, Registration No.

---

[3] Trademark registrations are subject to cancellation on a petition "by any person who believes that he is or will be damaged by the registration of a mark." 15 U.S.C. § 1064. The Defendants have also asserted affirmative defenses that Trademark No. 3, 397,050 is "invalid and unenforceable" and that the Lens Mark is "functional and is unprotectable under the common law and is not registerable on either Registers of the U.S. Trademark (Lanham) Act." (Affirmative Defenses ¶¶ 9, 10, ECF No. 92.)

3,397,050, and on the Defendant's affirmative defense that the Plaintiff's claims are barred by

the equitable defenses of laches, estoppel, acquiescence, and unclean hands. The Plaintiff argues

that the Defendants' incorporation of the Lens Mark for Registration No. 3,397,050 on its

original Series S2000 (and Series P2000) brand pressure gauges caused a likelihood of confusion

and constituted unlawful infringement under 15 U.S.C. § 1114. The Defendants argue that the

Plaintiff is not entitled to summary judgment because genuine issues of material fact exist

regarding whether the Lens Mark is protectable under trademark law and whether there was a

likelihood of confusion. In the Defendants' cross motion for partial summary judgment, they

argue that the Plaintiff cannot recover damages and that Kohl was not the alter ego of Sensocon.

The United States Code provides a civil remedy for the registrant of a registered

trademark against any person who,

> without the consent of the registrant . . . use[s] in commerce any reproduction,
> counterfeit, copy, or colorable imitation of a registered mark in connection with the
> sale, offering for sale, distribution, or advertising of any goods or services on or in
> connection with which such use is likely to cause confusion, or to cause mistake, or
> to deceive.

15 U.S.C. § 1114. To prevail on its trademark infringement claim, the Plaintiff must establish

that its mark is protectable and that the Defendants' unauthorized use of the mark was likely to

cause confusion among consumers. *CAE, Inc. v. Clean Air Eng'r, Inc.*, 267 F.3d 660, 673–74

(7th Cir. 2001) (citing *Eli Lilly & Co. v. Natural Answers, Inc.*, 223 F.3d 456, 461 (7th Cir.

2000) and *Smith v. Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir. 1993)).

**A.      Validity of the Lens Mark**

Registration under the Lanham Act affords the registrant a rebuttable presumption of

validity:

> [A] mark registered on the principal register . . . shall be prima facie evidence of the validity of the registered mark ... and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered.

15 U.S.C. § 1115(a); *see also Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 486 (7th Cir. 2007). However, "the presumption 'evaporates as soon as evidence of invalidity is presented.'" *Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011) (quoting *Door Sys., Inc. v. Pro–Line Door Sys., Inc.*, 83 F.3d 169, 172 (7th Cir. 1996)).

## 1.    *Functionality*

One recognized affirmative defense that an alleged trademark infringer can use is to show that the mark is "functional." 15 U.S.C. § 1115(b)(8); *Georgia-Pacific*, 647 F.3d at 727; *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 857 (7th Cir. 2010). The burden of showing functionality is on the Defendants as the parties seeking to invalidate the Lens Mark. *See Georgia-Pacific*, 647 F.3d at 727. If the Defendants can produce "strong evidence of functionality," the Plaintiff would then carry a "heavy burden of showing that the feature is not functional" *Id.* (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 30 (2001) and *Eco Mfg. LLC v. Honeywell Int'l, Inc.*, 357 F.3d 649, 653 (7th Cir. 2003)). "[T]he functionality of an asserted design can be determined on summary judgment in appropriate cases." *Georgia-Pacific*, 647 F.3d at 727 (citing *Jay Franco*, 615 F.3d at 857).

"A design is considered functional when it is 'essential to the use or purpose of the

device or when it affects the cost or quality of the device.'" *Jay Franco*, 615 F.3d at 857

(quoting *TrafFix*, 532 U.S. at 33). The Seventh Circuit recently explained:

> [I]f a design enables a product to operate, or improves on a substitute design in some way (such as by making the product cheaper, faster, lighter, or stronger), then the design cannot be trademarked; it is functional because consumers would pay to have it rather than be indifferent toward or pay to avoid it.

*Jay Franco*, 615 F.3d at 857. Courts look to several factors to determine whether a design meets the criterion of being functional. One element is the existence of any utility patents that involve or describe the functionality of the item's design element "because any design claimed in a patent is supposed to be useful." *Jay Franco*, 615 F.3d at 857 (citing 35 U.S.C. § 101 and *Brenner v. Manson*, 383 U.S. 519, 528–36 (1966)); *see also TrafFix*, 532 U.S. at 29 (finding that expired utility patents are "strong evidence that the features therein claimed are functional"). A second factor is the "utilitarian properties of the item's unpatented design elements." *Georgia-Pacific*, 647 F.3d at 728. A third consideration is whether advertising touts the utilitarian advantage of the design elements. *Id.* A court also considers the availability of alternative designs for the item's purpose, and the effect of the design on the item's quality or cost. *Id.*

Upon review of the summary judgment record, the Court finds that the Defendants have not presented "strong evidence" that the plurality of lines and raised rectangular portion is essential to the use or purpose of the gauges or that it affects the cost or quality of the gauge. The Defendants have not pointed to any utility patents that overlap with the Lens Mark, or identified any advertising materials that link the design of the gauge lenses to utilitarian benefits. Kohl stated in his deposition that when he was considering the design of Sensocon's product the "most important function was not necessarily the exact look of the gauge but was the size of the gauge, and that was done so that it could be easily switched to my customers." (Kohl Dep. 60, ECF No.

100.) The Defendants have not designated any facts showing that the design resulted in a comparatively simple or cheap method of manufacturing the gauges or otherwise impacted quality or cost. *Cf. Georgia-Pacific*, 647 F.3d at 731 (finding that the quilted diamond design of toilet paper increased product quality by improving softness and comfort, increasing bulk, enhancing roll structure, and preventing nesting and ridging). There is no evidence that the Plaintiff's gauges look the way they do to be better gauges, rather than to be a better way of identifying that the Plaintiff made them.

Budny, an employee of Dwyer for over 25 years, states in his Affidavit that the design on Dwyer's lenses is not essential to the use or purpose of the device and instead provides unique, distinctive, source identifying features. (Budny Dec. ¶ 24, ECF No. 98-3.) The Defendants have moved to strike Budny's statement because he did not personally design the lens and his conclusory statement is not supported by any evidence. The Court need not strike Budny's statement, as the Court does not rely on it to find that the Defendants have failed to present strong evidence of functionality. In fact, the only evidence the Defendant offers on the issue is the Affidavit statements of Kohl that the plurality of lines serves to mask the inner workings of the gauge so that the user can focus attention on the gauge's scale, and that the raised rectangular portion provides a flat surface on an otherwise domed-shaped lens to place the zero set or zero adjustment screw. (Kohl Aff. ¶¶ 3–5, ECF No. 113-10.) In his deposition, Kohl stated that the lines "distort the light to hide the mechanical workings behind it," but admitted that there were other ways to distort that light than with a plurality of horizontal lines. (Kohl Dep. 44, ECF No. 100.) Serving such a function, and meeting the definition of functionality for trademark purposes, are not the same inquiry. Even if the Court assumes the lens design serves such

purposes, the Court would rely on the reasoning set forth in *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 339–40 (7th Cir. 1985), to find that it was not functional. *Keene* dealt with a molded plastic office letter stacking tray that had irregular hexagons as end caps; each hexagon had an interior cutout. The court noted that end caps serve the function of making letter trays stable and separating the lower tray from the upper tray, and cutouts make them lighter while reducing the cost of materials. However, neither the irregular shape of the hexagon nor the shape of the cutout served any function. 778 F.2d at 342–43 (stating that the hexagonal shape of the end panel might be as "irrelevant to" the function of holding papers "as the fluting in the column is irrelevant to the column's function of holding up the roof"). Instead, these product features made the tray distinctive and enabled consumers to determine which firm made it. Likewise, here, even if a design on the lower portion of the lens face serves the purpose of hiding the inner workings of the gauge and the raised area provides a flat place for the zero set screw, neither the plurality of parallel lines nor the rectangular shape of the flat portion and the fact that it is raised and placed within the obscured area serve any function. Stated differently, the plurality of horizontal lines accommodates a useful function, but it is not essential to use that specific configuration to accomplish the goal of obscuring what is behind the design. *See Serv. Ideas, Inc. v. Traex Corp.*, 846 F.2d 1118, 1123 (7th Cir. 1988) (noting that "[a] design feature of a particular article is essential only if the feature is dictated by the functions to be performed; a feature that merely accommodates a useful function is not enough") (quoting *LeSportsac, Inc. v. K-Mart Corp.*, 754 F.2d 71, 76 (2d Cir. 1985)). Similarly, the raised rectangular portion accommodates a useful function, but it is not required if the gauge is to have a zero set screw. There is no evidence that the Defendants would be required to design around the plurality of lines with raised rectangular

portion to produce a gauge with equal efficacy and performance ability. As such, there was no

lack of alternative designs and the Defendants did not need to use the particular design of the

Lens Mark to manufacture a competitive product, and it is only when the exclusive use of a

feature puts a competitor at a "significant non-reputation-related disadvantage" that it becomes

functional and cannot serve as a trademark. *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159,

165 (1995). The Plaintiff's trademark does not fail for functionality.

## 2.      *Acquired Distinctiveness*

Even if a design's identifying aspects are not functional, a design may be protected as a

trademark only if it has acquired secondary meaning such that consumers associate the design

with a particular manufacturer. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205

(2000) (also referred to as acquired distinctiveness).

> The design . . . of a product may acquire a distinctiveness which serves to identify
> the product with its manufacturer or source; and a design . . . which acquires this
> secondary meaning, assuming other requisites are met, is a trade dress which may not
> be used in a manner likely to cause confusion as to the origin, sponsorship, or
> approval of the goods.

*TrafFix*, 532 U.S. at 28.[4] The Defendants argue that the Plaintiff's Lens Mark application before

---

[4]Count VII of the Plaintiff's Amended Complaint, which is not the subject of the Plaintiff's
Motion for Partial Summary Judgment or this Opinion, alleges trade dress infringement. The Plaintiff
alleges that its pressure gauges have a distinctive trade dress that has acquired secondary meaning, and
that Sensocon's use of its trade dress violates 15 U.S.C. § 11125(a). That section of the Lanham Act
provides a cause of action against:

> Any person who, on or in connection with any goods or services . . . uses in commerce any
> word, term, name, symbol, or device, or any combination thereof, or any false designation
> of origin, . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to
> the affiliation, connection, or association of such person with another person, or as to the
> origin, sponsorship, or approval of his or her goods.

15 U.S.C. § 1125(a). The Seventh Circuit has noted that trademark and trade dress protection both have
the same purpose. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 615 n.6 (7th Cir.

the USTPO did not demonstrate acquired distinctiveness. The presumption, however, is that it did. The USPTO found that the Plaintiff's lens design had acquired distinctiveness under 15 U.S.C. § 1052(f), and § 1115(a) thus entitles the Plaintiff to a presumption that its Lens Mark is valid. *See Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986) (registration of a mark "entitles the plaintiff to a presumption that its registered trademark is not merely descriptive or generic, or, if merely descriptive, is accorded secondary meaning"); *see also* 15 U.S.C. § 1057(b) (providing that a certificate of registration of a mark is prima facie evidence of the validity of the registered mark and the owner's exclusive right to use the registered mark). This presumption may be rebutted by establishing that the mark lacks secondary meaning. *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 639 (7th Cir. 2001); *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237–38 (5th Cir. 2010); 15 U.S.C. § 1119 (granting the court the power in an action involving a registered mark to order the cancellation of a registration). The effect of the statutory presumption is to shift the burden of production to the alleged infringer to prove the absence of secondary meaning. *Custom Vehicles*, 476 F.3d at 486; *see, e.g., Liquid Controls*, 802 F.2d at 938 (finding that the defendant had "introduced enough evidence of the genericness of the term 'liquid controls' to 'burst' the presumption created by section 1115(a)" where it pointed to dictionary definitions of the words making up the term and

---

1993) (trademark infringement claim resembled trade dress infringement) (citing *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 935–36 (7th Cir. 1989)). An infringement of trade dress is proven if: (1) the plaintiff's trade dress is inherently distinctive or has acquired secondary meaning; (2) the plaintiff's trade dress is primarily nonfunctional; and (3) the defendant's trade dress is confusingly similar, engendering a likelihood of confusion in the marketplace. *Roulo*, 886 F.2d at 935. Because the Lens Mark is part of the overall appearance, that is, the trade dress, of the Plaintiff's gauges, and because the Lens Mark is of the type that must have acquired secondary meaning and be nonfunctional to warrant trademark protection, the discussion of trademark infringement in this Opinion and Order will occasionally use terms that are related to trade dress claims.

submitted three patent applications that used the term to designate various mechanisms for controlling the flow or the level of liquid).

Secondary meaning occurs when, "in the minds of the public, the primary significance of a mark is to identify the source of the product rather then the product itself." *Wal-Mart Stores*, 529 U.S. at 211 (quoting *Inwood Labs, Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 851 n.11 (1982) (brackets omitted)); *see Qualitex v. Jacobson Prods. Co.*, 514 U.S. 159, 163 (1995). Secondary meaning arises when a mark "has been used so long and so exclusively by one company in association with its goods or services that the [design] has come to mean that those goods or services are the company's trademark." *Packman*, 267 F.3d at 641. It is not necessary that the public be aware of the identity of the producer, just that the public associate the trade dress with a single source. *Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1266–67 (7th Cir. 1989). The Seventh Circuit considers the following six factors in determining whether a mark has acquired secondary meaning: (1) direct consumer testimony and consumer surveys; (2) exclusivity, length and manner of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) established place in the market; and (6) proof of intentional copying. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992); *Echo Travel*, 870 F.2d at 1267.

The Defendants have not presented any evidence of its own tending to show that the Lens Mark has not acquired distinctiveness, instead focusing on what it considers to be deficient submissions by the Plaintiff to the USPTO. The Defendants argue that, in the Plaintiff's response to the USPTO, it "asserted little more than the duration of the use of the design" which "alone, is not conclusive with respect to acquired distinctiveness." (Defs.' Mem. 8, ECF No. 111.) The

Defendants argue that there is virtually no evidence before the Court consistent with the remaining relevant factors. The Plaintiff disagrees, noting that the Defendants' argument ignores the presumption of validity and is an inaccurate representation of the evidence of acquired distinctiveness it presented to the USPTO, including evidence of advertising expenses, examples of the Plaintiff's catalog advertising, sales information, and Eric Budny's sworn statement of his belief that anyone reasonably skilled in the pressure gauge market would recognize a pressure gauge including the Lens Mark as coming from the Plaintiff.

In this case, the direct evidence of consumers associating the Lens Mark with the Plaintiff's gauges is minimal. Although the Plaintiff has not presented any survey evidence to demonstrate secondary meaning, it has submitted consumer statements contained in email correspondence that shows these consumers associated the plurality of horizontal lines and raised rectangular portion on the lens of differential pressure gauges as being manufactured by the Plaintiff. An email that Kohl sent to an existing Dwyer customer about a product Sensocon was offering as an alternative to the differential pressure gauge he was using included a picture of the P2000 Sensocon gauge, which is substantially similar to the S2000 Sensocon gauge. The potential customer wrote to Kohl: "Looks like relabeled Dwyer gauge under licensing agreement? . . . What's the advantage in switching to Sensocon?" (Marty Lehner Email, ECF No. 102 at 19.) In a series of email between Kohl and Bill Branom when he was a Dwyer customer, Branom notes that the "S2000 series looks like a Dwyer Magnehelic." (Bill Branom Email, ECF No. 102 at 20.) For their part, the Defendants have not presented any evidence to suggest that consumers do not identify the Lens Mark with the Plaintiff. The presumption in favor of the validity and secondary meaning of the Lens Mark is not impacted by the consumer

association factor.

As to length and exclusivity of use, which can provide circumstantial evidence of acquired distinctiveness, there is no dispute that the Plaintiff has continuously used the Lens Mark on its gauges since the early 1960s, and that this use was exclusive of other manufacturers of gauges until 2006 when Sensocon began selling gauges with the same lens design. Regarding the manner of use, the Court has already determined that the design is not merely functional. The presumption, that the primary significance of the design is to identify the Plaintiff as the source and that it has acquired this meaning, remains intact given how long the Plaintiff was the exclusive source of the non-functional lens design.

The Defendants argue that the Plaintiff's advertising evidence fails to indicate what portion of its advertising expenditures involved the lens design at issue, or whether the Plaintiff was successful in educating the public to associate the Lens Mark with the Plaintiff. The Court notes that the advertising, in the form of catalogs and internet promotions, includes photographs of the Plaintiff's gauges that prominently display the ornamental design of the Lens Mark. *See, e.g., Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 292 (7th Cir. 1998) (finding that the plaintiff's advertising that prominently featured the shape of the product could function to draw consumers' attention to the shape and to associate it with the plaintiff). Even the advertisements and application guides that use illustrations and graphic drawings of the gauges portray them with the plurality of lines and raised rectangular portion. This advertising has been ongoing since 1963. The consumer statements that a Sensocon gauge incorporating this same lens design "looks like" the Plaintiff's Magnehilic gauge are some evidence that the Plaintiff's marketing has successfully informed those in the differential pressure gauge market that the lens design is

associated with the Plaintiff. This factor weighs in favor of acquired distinctiveness.

A high volume of sales can support a finding of secondary meaning. *See Custom Vehicles*, 476 F.3d at 485–86. The Plaintiff submits that sales of its products bearing the Lens Mark for the years 2000 through 2009 exceed 4,000,000 units and over $150,000,000 in revenue. The Plaintiff does not submit evidence concerning what portion of the differential pressure gauge market this represents, but the Defendants present no evidence that it is insignificant for a niche product market. Nor do the Defendants present any evidence with respect to the Plaintiff's established place in the differential pressure gauge market to suggest that its design has not acquired distinctive meaning in that market. Kohl testified that when Sensocon introduced its gauge in 2006, "Dwyer had been the only one that made a product like that for 50 years, so there . . . was no competition." (Kohl Dep. 88.) The Plaintiff distributes its product throughout the United States to original equipment manufacturers, distributors, and end users and other customers. The Plaintiff makes sales directly through the internet and through distribution of catalogs and product bulletins. Customers can also request that products incorporating the Lens Mark be private labeled.

There is no dispute that the Defendants copied the design of the Plaintiff's Lens Mark to offer a product that would directly compete with the Plaintiff's product. But "[c]opying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 663 (7th Cir. 1995). Copying that is inspired by a product that works well is permissible while copying that is inspired by a desire to usurp a producer's goodwill is not. *Id.* at 658 ("effective competition and the penumbra of the patent laws require that competitors be able to slavishly

copy the design of a successful product."). Genuine issues of material fact exist regarding the inspiration for copying. First, intent is not an issue well suited for summary judgment. Second, Kohl stated in his deposition, in response to a question why he chose to sell a mechanical differential pressure gauge that looked like the Plaintiffs, that "[t]he most important function was not necessarily the exact look of the gauge but was the size of the gauge, and that was done so that it could be easily switched to my customers." (Kohl Dep. 60.) He also testified that, at the time he selected the S2000 gauge, he was not aware that the Plaintiff's design was a trademark and he did not give consideration to whether it would benefit Sensocon or its customers to select a gauge that looked like the Plaintiff's. He put the Sensocon name on the label in at attempt to differentiate his gauges and, viewing the inferences most favorable to the Defendants, to avoid confusion. This Court will award this factor no weight.

The function of the presumption is to incite evidence of invalidity. *See Door Sys.,*.83 F.3d at 172. The Court finds that the Defendants' submissions do not present such evidence and are insufficient to overcome the presumption of distinctiveness that accompanies the registration of the Lens Mark. Because there is no evidentiary conflict on the issue of the validity of the Plaintiff's trademark, the Court moves on to discuss whether the Plaintiff has established a likelihood of confusion as a matter of law.

**B.    Likelihood of Confusion**

Although the finding that consumers are likely to be confused about the origin of a product is generally a question of fact, the Plaintiff notes that it can be resolved on summary

judgment "'if the evidence is so one-sided that there can be no doubt about how the question should be answered.'" (Pl.'s Mem. 4, ECF No. 98 (quoting *Door Sys.*, 83 F.3d at 171). *See also CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 677 (7th Cir. 2001) (stating that the district court's grant of summary judgment for the plaintiff "constitute[d] a finding that, even resolving all factual disputes in favor of [the defendant], there is a likelihood of confusion as a matter of law"); *Packman*, 267 F.3d at 637. The likelihood of confusion analysis is an equitable balancing test involving seven factors:

> (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) whether actual confusion exists; and (7) whether the defendant intended to "palm off" his product as that of the plaintiff.

*CAE, Inc.*, 267 F.3d at 677–78 (citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897–98 (7th Cir. 2001)). "No single factor is dispositive, and courts may assign varying weights to each of the factors depending on the facts presented, although, in many cases, the similarity of the marks, the defendant's intent, and actual confusion are particularly important." *Packman*, 267 F.3d at 643 (citing *Ty, Inc.*, 237 F.3d at 1044); *see also CAE, Inc.*, 267 F.3d at 678 (citing *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000)). The Court will consider whether the disputes surrounding any of these factors create a genuine material issue of triable fact as to the likelihood of confusion, or whether the Plaintiff has established that no reasonable juror could conclude that there is no likelihood of confusion.

The Plaintiff's Series 2000 Magnehelic® brand pressure gauge and the Sensocon Series S2000 gauge are shown below:

 

1.      *Similarity of the Marks*

The Plaintiff argues that the Defendants' original Series S2000 and P2000 brand pressure

gauge products include a lens design that is substantially identical to the Plaintiff's Lens Mark.

The Court must view the two marks as a whole and compare them "in light of what happens in

the marketplace and not merely by looking at the two marks side-by-side." *AutoZone, Inc. v.*

*Strick*, 543 F.3d 923, 930 (7th Cir. 2008) (quoting *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th

Cir. 2004)).

> The test is not whether the public would confuse the *marks*, but whether the viewer
> of an accused mark would be likely to associate the product . . . with which it is
> connected with the source of products . . . with which an earlier mark is connected.
> The court should therefore consider whether the customer would believe that the
> trademark owner sponsored, endorsed or was otherwise affiliated with the product.

*AutoZone, Inc.*, 543 F.3d at 930 (brackets, quotations marks, and citations omitted).

The Defendants argue that a person viewing the Sensocon lens would see "SENSOCON"

written on the face of the gauge, and that this creates, at the very least, a genuine issue of

material fact regarding the similarity of the marks. This does not change the fact that the plurality of horizontal lines and raised rectangular portion, which are almost identical, appear in the same context—on a gauge lens—and nothing else makes the lens visually distinct. A consumer who is not viewing the gauges side by side may not even take notice of the name on the gauge. In addition, the Plaintiff has private labeled gauges for original equipment manufacturers, and thus consumers may well think that the Plaintiff private labeled their gauges for Sensocon. *See, e.g., Ty, Inc.*, 237 F.3d at 899 (finding that because Ty licensed its mark for use with McDonald's promotions and used the mark in connection with other products, consumers might think that Ty licensed or sponsored the infringing product). Sensocon also private labels gauges for other companies. When it does so, the Sensocon label is not used. Kohl provided the following deposition testimony with regard to the similarity of the Sensocon Series S2000 and the Dwyer Magnehelic gauges:

> Q. Do they have the same size? A. Yes. Q. The same shape? A. Yes. Q. *Did the original Sensocon S2000 include the same lens as is found in the Dwyer Magnehelic gauges? A. Yes.* Q. Are the gauges substantially the same color? A. No. Q. What are the color differences? A. The S2000 has actually changed a couple of times, but originally it was a much darker color than the Dwyer gauge. Q. Are they both gray? A. yes. Q. So when you say "difference," you mean in the shade of gray for the color? A. Yes.

(Kohl Dep. 44–45, ECF No. 100 (emphasis added).); *see also id.* at 41–42 ("Q. Would you agree that the lens on the . . . gauge that Sensocon originally sold as the S2000 is substantially identical to the lens on the Dwyer Magnehelic gauge? A. Yes.").

The Court finds that even with the word SENSOCON written on the face of the product, a customer would likely believe that the Plaintiff sponsored, endorsed, or was otherwise affiliated with the product given the plurality of horizontal lines and raised rectangular portion

on the lower portion of both lenses. There is no genuine issue of material fact surrounding this factor, and it weighs in favor of finding that customers viewing the products in the marketplace will likely be confused.

### 2.    *Similarity of Products*

Products are deemed to be similar for purposes of the trade dress analysis if the accused product "is one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by" the holder of the protected trade dress. *Ty, Inc.*, 237 F.3d at 900 (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir. 1992)); *see also McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1169 (7th Cir. 1986) (clarifying that "the rights of an owner of a registered trademark extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods") (quoting *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985) (brackets and ellipsis omitted)). The products at issue are both differential pressure gauges for use in any application that requires monitoring the difference in pressure between two points. In fact, it is because the products are for the same consumer use that Sensocon offers its product as an alternative to and replacement for the Plaintiff's product. The Defendants argue that they avoided confusion by placing SENSOCON in large font on the face of its gauges. This argument does not address the similarity of the products; placing a different name on the gauge does not change the nature of the product. The buyers of differential pressure gauges would certainly have reason to believe that the gauge offered by Sensocon was affiliated with, if not originating from, the Plaintiff—a

long time manufacturer of the same kind of gauges and other control instruments, who often private labeled these gauges. Because there is no genuine dispute that the purchasing public could believe that a single source produced both products given their identical nature, this factor weighs in favor of a likelihood of confusion.

**3.      *Strength of the Plaintiff's Lens Mark***

"The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular source." *Eli Lilly*, 233 F.3d at 464 (quoting *Sands, Taylor & Woods*, 978 F.2d at 959) (ellipsis omitted); *see CAE, Inc.*, 267 F.3d at 684. "The strength of a mark usually corresponds to its economic and marketing strength." *AutoZone, Inc.*, 543 F.3d at 933. The Defendants argue that the Plaintiff's mark is not strong because it was not registered until March 18, 2008, that Sensocon had used the mark for over a year before it was registered, and that the Plaintiff has been using it for less than a year when it filed this lawsuit. The Defendants' argument does not address the economic and marketing strength of the Plaintiff's lens design in the instrument control market, or its tendency to identify the goods sold under the mark as emanating from a particular source. The Defendants have not presented any case law that suggests the strength of mark inquiry is dependent on registration. Logic dictates that if that were the test, then the factor would simply ask how long the mark had been registered. It is undisputed that the Plaintiff's registration of the Lens Mark is the only registration for that mark, and that no other manufacturer of pressure gauges actively used a similar design before Sensocon entered the market. In Kohl's own words, in 2006, "Dwyer had been the only one that made a product like

that for 50 years, so there . . . was no competition." (Kohl Dep. 88.) In any event, whether a mark is strong or weak is less important when, like here, "the conflicting mark is identical and the goods are closely related." *Sands, Taylor & Wood*, 978 F.2d at 959 (quotation marks omitted).

### 4.     *Area and Manner of Concurrent Use*

"When considering the area and manner of concurrent use factor" the court has "to assess whether 'there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties.'" *Ty, Inc.*, 237 F.3d at 900 (quoting *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990)). Relevant factors include the relative geographical distribution areas, whether there is evidence of direct competition between the products, and whether the products are sold to consumers in the same stores or through the same marketing channels. *Ty, Inc.*, 237 F.3d at 900. The undisputed evidence supports the conclusion that this factor weights in favor of a likelihood of confusion.

The parties display their products using the same channels of trade and target the same audiences. (Defs.' Revised Answer ¶ 22, ECF No. 92 (admitting that Sensocon sells its pressure gauge products in the same channels of trade that the Plaintiff sells its pressure gauge products in direct competition with the Plaintiff); Kohl Dep. 60, ECF No. 100 ("Q. Does Sensocon sell the S2000 and P2000 through the same channels of trade as Dwyer sells the Magnehelic pressure gauges, meaning both directly through distributors and ultimately to end users? A. Yes.").)

### 5.     *Degree of Care*

"The degree of care factor seeks to distinguish how likely the relevant group of consumers is to distinguish between different products." *S Indus., Inc. v. JL Audio, Inc.*, 29 F. Supp. 2d 878, 892 (N.D. Ill. 1998). Where the cost of the item is high, courts assume that purchasers are more likely to be discriminating. *Maxim's Ltd. v. Badonsky*, 772 F.2d 388, 393 (7th Cir. 1985). However, the degree of customer care does not depend solely on price. *See Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1230 (7th Cir. 1993) (stating that a reasonably jury could conclude that customers take care when purchasing clothing ranging from $19.95 to $39.95). Whether a relevant group of consumers is likely to buy in haste or on impulse is also relevant. *S Indus.*, 29 F. Supp. 2d at 892; *see also Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1365 (7th Cir. 1995) (stating that undisputed testimony that brooms were lost-cost items generally purchased on impulse was relevant to likelihood of confusion analysis "because presumably consumers take less time purchasing low-cost items, and haste increases the possibility of confusion") (quoting *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993)).

A variety of consumers purchase differential pressure gauges, which are moderately priced items (around $50.00 each). The Plaintiff, relying on Budny's affidavit, asserts that because of the wide range of uses for its gauges, customers cannot all be generally characterized as sophisticated purchasers. The Defendants argue that this statement from Budny's affidavit should be stricken because it is not grounded in observation or other first-hand experiences. The Court need not strike the statement, as it does not rely on it.

Given the discrete uses for differential pressure gauges and their moderate price, it is reasonable to infer that consumers would take great care to ensure that the gauges they purchase

will suit their applications and be compatible with their existing mechanical instruments. This is presumably more true for original equipment manufacturers who purchase the gauges in large quantities than for end users. None of the evidence before the Court suggests that a differential pressure gauge is the kind of item that consumers buy on impulse. However, this does not mean that these discerning consumers of gauges are also sophisticated in trademarks. *See CAE, Inc.*, 267 F.3d at 683 ([A]lthough many of the parties' customers are sophisticated and decide to buy only after extensive negotiations, these customers' technical sophistication about their particular industry does not equate to trademark sophistication.") The sale of private label gauges, the ease of ordering products through internet-based catalogs, and the similar channels of marketing all increase the possibility of consumer error despite sophistication regarding gauges and their application. That said, the evidence, when viewed most favorably to the Defendants, leaves room for the conclusion that consumers will exercise a high degree of care to determine the manufacturer of the product. Email inquires by consumers to the Defendants whether Dwyer manufactured the Sensocon gauge evidence that these consumers exercised care to determine the source of the gauges and attempted to clear up any confusion. Given the limited evidence with regard to this factor, and the competing inferences from the evidence, the Court must consider whether the genuine disputes surrounding this factor, in light of all the other factors, are sufficient for a reasonable fact finder to conclude that there is no likelihood of confusion.

6.      *Actual Confusion*

"[T]his circuit has repeatedly stated that actual confusion need not be demonstrated; the test is likelihood of confusion and actual confusion is only one element of the test." *AHP*

*Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) (citing *Computer Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1070 (7th Cir. 1992) and *McGraw–Edison*, 787 F.2d at 1172–73). However, where evidence of actual confusion exists, it is entitled to substantial weight. *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1090 (7th Cir. 1988).

An email that Kohl sent to an existing Dwyer customer about a product Sensocon was offering as an alternative to the differential pressure gauge he was using included a picture of the S2000 Sensocon gauge (or a substantially similar model). The potential customer wrote to Kohl: "Looks like relabeled Dwyer gauge under licensing agreement? . . . What's the advantage in switching to Sensocon?" (Marty Lehner Email, ECF No. 102 at 19.) Kohl testified: "Q. What is your understanding as to why he would have asked that question? A. Because they look similar." (Kohl Dep. 86.) With respect to whether there was anything about the gauge that would have communicated to anyone that it was a Dwyer gauge, Kohl stated, "Well, at the time in 2006, Dwyer had been the only one that made a product like that for 50 years, so there is no—there was no competition." (*Id.* at 88.)

In an email from another company interested in getting more information about the S2000 differential pressure gauges, an export sales employee asks, "Are the gauges manufactured by Dwyer Instruments or by yourself?" (Tero Mehtala Email, ECF No. 102 at 21.) In a request for information submitted to Sensocon through its website, the comment section reads "Information on prices of magnehelic gages and literature." (May 30, 2009, Request for Information, ECF No. 102 at 23.) Kohl responded, "Our product is similar to the Magnehelic,

but is our product and not manufactured by Dwyer." (*Id.*)[5] These examples are sufficient for this factor to weigh in favor of the Plaintiff.

**7.      *Intent to "Palm Off" Product***

Kohl stated in his deposition, in response to a question why he chose to sell a mechanical differential pressure gauge that looked like the Plaintiffs, that "[t]he most important function was not necessarily the exact look of the gauge but was the size of the gauge, and that was done so that it could be easily switched to my customers." (Kohl Dep. 60.) He also testified that, at the time he selected the S2000 gauge, he was not aware that the Plaintiff's design was a trademark and he did not give consideration to whether it would benefit Sensocon or its customers to select a gauge that looked like the Plaintiff's. He put the Sensocon name on the label in at attempt to differentiate his gauges.

The Plaintiff argues that the Defendants' intent can be inferred from their inclusion of the lens design despite knowing that only the Plaintiff had previously used it, and by their failure to respond to the Plaintiff's cease and desist letter. Viewing the evidence most favorably to the Defendants, other explanations, other than a desire to confuse consumers, may exist for these actions. Subjective intent is not amenable to summary judgment proceedings. The evidence does not establish that the Defendants intended to trade off the goodwill of the Plaintiff's products in the marketplace and issues of fact surround this factor.

---

[5]The Plaintiff also points to a series of emails between Kohl and Bill Branom, a Dwyer customer, to show actual confusion. Branom notes that the "S2000 series looks like a Dwyer Magnehelic." (Bill Branom Email, ECF No. 102 at 20.) This communication, which was a response to Kohl's email advising that Sensocon had an alternative to the differential pressure gauges he was currently using, does not show that Branom was actually confused, only that he thought the two gauges looked alike.

**8.**     *Balance of Factors*

It is undisputed that Sensocon placed the same plurality of horizontal lines and raised rectangular portion on the bottom of a product that was identical to the Plaintiff's well-established product, and then promoted that product through the same channels of trade and in the same markets. While Kohl may not have intended to confuse customers when he introduced the competing product, there is evidence that potential customers were confused about the source of the Sensocon gauges. None of the other factors are strong enough to outweigh the factors that, in balance, lead to the conclusion that the Plaintiff has established a likelihood of confusion between its pressure gauges and the nearly-identical looking Sensocon Series S2000 differential pressure gauges.

**C.     Laches Affirmative Defense**

The rebuttable presumption of validity for registered trademarks does not preclude another individual from proving any legal or equitable defense or defect that could have been raised if the trademark were not registered. 15 U.S.C. § 1115(a). The Defendants maintain that genuine issues of material fact exist with respect to their affirmative defense that the Plaintiff's claim is barred by the doctrine of laches, which is an affirmative defense that is "derived from the maxim that those who sleep on their rights, lose them." *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 792 (7th Cir. 2002) (citing *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999)). In a trademark case, the doctrine applies if the defendant shows that (1) the plaintiff had knowledge of the defendant's use of an allegedly infringing mark, (2) the plaintiff inexcusably delayed in taking action with respect to the defendant's use, and (3) the defendant

would be prejudiced by allowing the plaintiff to assert its rights at this time. *Chattanoga*, 301 F.3d at 792–93. The Seventh Circuit applies a "sliding scale" approach. The magnitude of prejudice that must be shown has an inverse relationship with the length of delay; that is, the longer the delay, the less prejudice that need be shown. *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 733 (7th Cir. 2003); *Hot Wax*, 191 F.3d at 824.

The Plaintiff admits that it became aware of the Defendants' actions in late 2006. The Plaintiff issued the cease and desist letter on January 8, 2007. The letter set forth the various rights that the Plaintiff believes the Defendants were violating, including the trade dress of its Magnehelic® pressure gauges, as shown in an illustration that included a plurality of horizontal lines and a raised rectangular portion on the bottom portion of the gauge lens. The Plaintiff did not delay in writing the letter, and did not withdraw the objections set forth in the letter. However, the Defendants claim that there is a question of fact whether the two-year period between the cease and desist letter and filing this lawsuit, on January 7, 2009, represents an unreasonable delay. With respect to whether the Plaintiff inexcusable delayed in taking action with respect to the defendant's use, the Court looks to "analogous state statutes of limitations" to determine whether a presumption of laches should apply. *Chattanoga*, 301 F.3d at 793. Indiana's most analogous state statute is the Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 *et seq.*, which includes a two-year statute of limitations. Ind. Code § 24-5-0.5-5(b). The Plaintiff's suit was brought within that period, and the delay is thus presumptively reasonable.[6] Even if the delay was outside the analogous two-year statute of limitations, the short delay would require an

---

[6] In addition, the Plaintiff would not have had a cause of action for trademark infringement until May 2008 when it began displaying the ® on its lenses informing others of its registration.

inversely greater degree of prejudice for the doctrine to apply. The Defendants cannot make this showing.

The Defendants argue that because Sensocon actively pursued the growth of its business during this time, a question of fact exists regarding the prejudice it experienced. Sensocon has the burden of proof on this factor and the conclusory assertion that it actively pursued the growth of its business, without any details as to the input of time or money or the success of such efforts, is not sufficient. "A delay prejudices a defendant when the assertion of a claim available for some time would be inequitable in light of the delay in bringing that claim and ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Chattanoga*, 301 F.3d at 795 (citing *Hot Wax*, 191 F.3d at 824). For example, "[p]rejudice may be shown if the plaintiff's unexcused failure to exercise its rights caused the defendant to rely to its detriment and build up a valuable business around its trademark. *Id.* (citing *Hot Wax*, 191 F.3d at 824). In *Hot Wax*, the defendant invested significant amounts of time and money in product development and advertising over a ten to twenty-year period while the plaintiff chose not to challenge the defendant' use of the disputed mark. 191 F.3d at 824. The court found prejudice because had the plaintiff pressed its claim in a timely manner, the defendant could have invested its time and money in other areas or simply renamed its product. *Id.* In *Chattanoga*, the court found prejudice when the plaintiff, a manufacturer of women's apparel who had a trademark for JORDAN, delayed challenging the defendant's use of the same term in Michael Jordan-endorsed Nike products. 301 F.3d at 795. The defendant had already spent over fifteen years and millions of dollars annually to promote the products, and had become a market leader. *Id.* The Defendants have not presented any evidence along the lines of

that considered in *Hot Wax* and *Chattanoga* from which a reasonable jury could conclude that it was prejudiced by the Plaintiff's delay.

The Defendants have not presented any evidence on the affirmative defenses of estoppel, acquiescence, and unclean hands. The Defendants were required to marshal and present the Court with the evidence upon which a reasonable jury could rely to find in their favor. *See Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Because they have not done so, the Plaintiff is entitled to summary judgment on these affirmative defenses.


**D.      Tony Kohl's Personal Liability**

The Plaintiff asserts that Kohl is personally liable for Sensocon's violations "as the sole individual directing the acts of infringement for his personal benefit." (Pl.'s Mem. Opp'n 3, ECF No. 108.) The Plaintiff asserts that Kohl is the alter ego of Sensocon and has personally directed the acts of infringement.

A corporation, like Sensocon, is a legal entity separate and distinct from its shareholders and officers. *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1231–32 (Ind. 1994). As such, corporate officers and shareholders acting on behalf of the corporation are generally not liable for the contractual obligations of the corporation. *Id.* at 1231. Indiana Courts are reluctant to disregard the corporate entity, but will disregard the corporate form to prevent fraud or unfairness to a third party. *Id.* at 1232. Under this "piercing the corporate veil" theory, an individual is deemed to be the "alter ego" of a corporation with the result that the individual becomes liable for all debts and obligations of the corporation, just as if there had been no corporation at all and the individual conducted the corporation's business as a personal venture.

The burden is on the party seeking to pierce the corporate veil to prove, by a preponderance of the evidence, (1) that the corporate form was so ignored, controlled, or manipulated that it was merely an instrumentality of another and (2) that misuse of the corporate form would constitute fraud or promote injustice. *Escobedo v. BHM Health Assocs., Inc.*, 818 N.E.2d 930, 933 (Ind. 2004); *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994). To determine whether a party has met this burden, a court considers whether evidence has been presented showing: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representations by corporate shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form. *Escobedo*, 818 N.E.2d at 933; *Aronson*, 644 N.E.2d at 867. "This list of factors is not necessarily exhaustive, and all factors need not be shown to support a decision to pierce the corporate veil." *Fairfield Dev., Inc. v. Georgetown Woods Sr. Apartments Ltd. P'ship*, 768 N.E.2d 463, 469 (Ind. Ct. App. 2002).

The Plaintiff acknowledges the factors that a court considers in the veil-piercing analysis, but then ignores these factors in its assessment of Kohl's relationship with Sensocon. The Plaintiff presents no evidence that Sensocon was undercapitalized, did not have corporate records, or ignored corporate formalities. The Plaintiff has not cited any evidence to suggest that Kohl commingled his assets and affairs with Sensocon's, used the corporate form to promote fraud, or payed his individual expenses with corporate funds. The evidence the Plaintiff has presented is unremarkable in light of the pertinent standard. The Plaintiff argues that the Court should pierce Sensocon's corporate veil because Kohl is the sole shareholder and, until January

2011, was the sole employee, he has increased his salary by about 85% since the beginning of this lawsuit, and the Defendants opposed a deposition of Sensocon on grounds that it would be cumulative and duplicative because the Plaintiffs had already deposed Kohl in his individual capacity.

The Plaintiff has not attempted to analyze the significance of Kohl's position as Sensocon's sole shareholder for purposes of piercing the corporate veil. *See, e.g., Comm'n, Dep't of Envtl. Mgmt. v. RLG, Inc.*, 755 N.E.2d 556, 563 (Ind. 2001) ("Roseman is entitled to the benefit of corporate limited liability even if he owned all of the shares of RLG and was its only officer and director. A corporate officer is not liable simply because of his position within the corporation."). That Kohl was the sole shareholder only shows that he is the individual the Plaintiff is attempting to hold liable through an alter ego theory. Likewise, Kohl's increase in his salary does not show that Kohl used Sensocon as a shell to conduct his personal business. The Plaintiff does not make any attempt to show that the salary was inappropriate for a person in Kohl's position or depleted the corporations assets. The Plaintiff also points to Sensocon's opposition to producing a corporate representative for deposition under Federal Rule of Civil Procedure 30(b)(6) as evidence that Sensocon and Kohl are one in the same. Sensocon's argument in opposition to the Rule 30(b)(6) deposition is not the equivalent of evidence or proof. Moreover, Sensocon's argument, viewed in its entirety, was that the Plaintiff asked Kohl to testify on behalf of Sensocon during his deposition and that he indeed testified regarding several corporate matters, thus providing the Plaintiff with the deposition of a corporate representative. Viewed in this context, Sensocon does not appear to have suggested that Sensocon and Kohl are one in the same, but to have claimed that a second deposition would not yield any additional

information. Ultimately, the Court was not persuaded by Sensocon's argument and granted the Plaintiff's motion to compel the designation and deposition of a corporate representative. In doing so, the Court recognized "the qualitative legal distinctions between the testimony given in an individual capacity and the testimony given as a formally designated corporate representative." (Order 3, ECF No. 78.) The Court also notes that, if it were appropriate to rely on these arguments set forth in the parties' briefing on the motion to compel, it would be equally appropriate to rely on the Defendants' pleadings, which deny that Sensocon is the alter ego of Kohl or that they have a unity of interest. The Plaintiff's assertion that Sensocon's position with respect to the Rule 30(b)(6) deposition demonstrates that the Defendant's consider Sensocon and Kohl to be on in the same, and that this supports the conclusion that Sensocon is the alter ego of Kohl, is unpersuasive.

The Plaintiff has failed to carry its burden of showing that a genuine issue of fact exists regarding whether Sensocon is a shell for the conduct of Kohl's personal business and that the corporate form has been abused to the point of promoting injustice or fraud. However, the Plaintiff presents an alternative argument in support of Kohl's personal liability. The Plaintiff argues that Kohl is liable because he personally committed, directed, and was the moving, active force behind the infringement of the Plaintiff's intellectual property rights, including trademark infringement.

The Seventh Circuit has held that, in a trademark infringement case, an individual such as an owner or president of a corporation can be held personally liable, if he was "personally involved in the commission of the tort by his corporation." *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 994 (7th Cir. 2004); *see also Microsoft Corp. v. Rechanik*, 249 Fed. Appx. 476,

478 (7th Cir. 2007) (stating that "[a]n individual can be jointly liable for a company's infringing conduct" in an action involving trademark infringement claims, unfair and deceptive competition claims, and state common law claims) (citing *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 971 (2d Cir. 1997) (copyright infringement) and *Chanel, Inc. v. Italian Activewear of Fla.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (trademark infringement)); *David Berg &Co. v. Gatto Int'l Trading Co.*, 884 F.2d 306, 311 (7th Cir. 1989) ("Because unfair competition and trademark infringement are tortious, the doctrine of joint tortfeasors does apply.") (citing *Smithkline Beckman Corp. v. Pennex Prods. Co.*, 103 F.R.D. 539, 540 (E.D. Pa. 1984)). "Every person actively partaking in, lending aid to, or ratifying and adopting such acts is liable equally with the party itself performing these acts." *David Berg*, 884 F.2d at 311 (citing *Smithkline*, 103 F.R.D. at 540). The Court notes that, long ago, the Seventh Circuit adopted a standard for holding a corporate officer liable for direct infringement that requires that the officer have exceeded his corporate officer duties as follows:

> [I]n the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction. . . . It is when the officer acts willfully and knowingly—that is, when he personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability—that officers are held jointly with the company.

*Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir. 1926); *see also Grice Eng'g, Inc. v. JG Innovations, Inc.*, 691 F. Supp. 2d 915, 925 (W.D. Wis. 2010) (citing *Dangler* as "still the law of the Seventh Circuit for direct patent and trademark infringement claims"); *Syscon, Inc. v. Vehicle Valuation Servs., Inc.,* 274 F. Supp. 2d 975, 976 (N.D. Ill. 2003) (noting that *Dangler* remains the law of this Circuit) (citing *Kohler Co. v. Kohler Int'l, Ltd.*, 196 F. Supp. 2d 690, 694

(N.D. Ill.2002) and *Drink Group, Inc. v. Gulfstream Commc'ns, Inc.*, 7 F. Supp. 2d 1009, 1010 (N.D. Ill. 1998)).

It is undisputed that Kohl, as the founder, shareholder, and sole employee of Sensocon, participated directly in the activities that the Plaintiff claims constitute infringement of its intellectual property rights in the Lens Mark. He contacted the Chinese company that would manufacture the infringing gauge and approved the design, and he contacted potential customers in a sales capacity and answered inquires from potential customers regarding the Sensocon gauges. He thus "personally participate[d] in the manufacture [and] sale of the infringing article," *Dangler*, 11 F2d at 947, and the special showing for personal liability has been established. Kohl's only response to the Defendants' argument that he is personally liable because he participated in the infringement is his assertion that the Plaintiff cannot proceed under the direct liability theory because the Plaintiff only alleged that he was liable on an alter ego theory with respect to Count I of the First Amended Complaint.

Paragraph 14 of the First Amended Complaint alleges that Sensecon "through the direction of Kohl" has been selling infringing pressure gauges. (ECF No. 52.) Paragraph 25 states: "SENSOCON *and KOHL* are using trademarks in connection with gauges with pressure gauge products sold by SENSOCON that include a lens identical with, substantially indistinguishable from and confusingly similar to, the trademarks used by DWYER in connection with the sale of DWYER pressure gauges." (*Id.* (emphasis added).) Similarly, throughout the assertions set forth under Count I, the Plaintiff alleges that Sensocon and Kohl committed acts that infringed upon its registered mark. Then, in paragraph 40, the Plaintiff alleges that Sensocon and Kohl "as its owner, president, director *and* alter ego, have willfully

and deliberately infringed." (First. Am. Compl. ¶ 40 (emphasis added).) These allegations, when read in their entirety, do not suggest that the Plaintiff was asserting alter ego as the only mechanism by which Kohl was responsible for trademark infringement. The Court finds that the Plaintiff is entitled to summary judgment against Kohl for trademark infringement as alleged in Count I of the First Amended Complaint.

In ruling on a summary judgment motion, the court must decide whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Here, the undisputed facts require that the Plaintiff prevail on its claim that the Defendants incorporation of the Lens Mark for Registration No. 3,397,050 on it original Series S2000 brand pressure gauges caused a likelihood of confusion and constituted unlawful infringement under 15 U.S.C. § 1114. The finding of liability does not resolve issues related to damages, and does not address the Series P2000 brand gauges or the second generation gauges.

## CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART [ECF No. 97], the Defendants' Motion to Strike [ECF No. 114] is DENIED, and the Defendants' Motion for Partial Summary Judgment [ECF No. 103] is DENIED IN PART and REMAINS UNDER ADVISEMENT IN PART.

SO ORDERED on March 23, 2012.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION