# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

DWYER INSTRUMENTS, INC.,    )
    )
    Plaintiff,    )
    )
v.    )    CAUSE NO.: 3:09-CV-10-TLS
    )
SENSOCON, INC., and TONY E. KOHL,    )
    )
    Defendants.    )

## OPINION AND ORDER

The Plaintiff, Dwyer Instruments, Inc. (Dwyer), has sued the Defendants, Sensocon, Inc. (Sensocon), and its owner and operator, Tony Kohl (Kohl) (collectively the Defendants), for trademark infringement, trade dress infringement, counterfeiting, unfair competition, false designation of origin, and copyright infringement. This lawsuit centers around the manufacture, marketing, and sale of differential pressure gauges. The Plaintiff is a long time manufacturer of these products. The Defendants are newcomers to the market—Kohl left his employment with the Plaintiff and started Sensocon. The Plaintiff alleges that the Defendants' business has been fraught with violations of the Plaintiff's intellectual property rights.

The Defendants have moved for partial summary judgment [ECF No. 103]. Kohl moves for summary judgment on all counts of the Plaintiff's First Amended Complaint on grounds that he is not personally liable for Sensocon's actions because it is a separate legal entity and he is not Sensocon's alter ego. Sensocon argues that the Plaintiff's claims are either subject to limited damages or should be dismissed in their entirety as a matter of law. The Court previously denied the portion of the Defendants' Motion that requested summary judgment on Count I of the First Amended Complaint, which asserts a claim for trademark infringement on United States Trademark Registration No. 3,397,050 for the lens design, specifically for a plurality of

horizontal lines and raised rectangular portion on the lens face of a differential pressure gauge. Instead, the Court granted in part the Plaintiff's Motion for Partial Summary Judgment on this same count, finding that the Plaintiff had established the Defendants' violation of its registered trademark as a matter of law. This Opinion and Order addresses the remainder of the Defendants' Motion for Partial Summary Judgment. The counts under review, either in whole or in part, are:

> Count II—Federal Trademark Infringement (15 U.S.C. § 1114) for the Plaintiff's Magnehelic® Mark
>
> Count III—Federal Trademark Infringement (15 U.S.C. § 1114) for the Dwyer® Mark
>
> Count IV—Federal Unfair Competition/False Designation of Origin (15 U.S.C. § 1125) for the Magnehelic® Mark, the Dwyer® Mark, and the lens design.
>
> Count V—Common Law Trademark Infringement/False Designation of Origin for "Series 2000"
>
> Count VI—Common Law Unfair Competition
>
> Count VII—Trade Dress Infringement (15 U.S.C. § 1125(a)) for the lens design
>
> Count VIII—Copyright Infringement (17 U.S.C. § 501)
>
> Count IX—Counterfeiting (15 U.S.C. § 1114)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the facts supported by materials in the record show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. "Summary judgment is only appropriate if the evidence submitted below reveals no genuine issue as to any material fact and the moving party

(the defendant) is entitled to judgment as a matter of law." *Goodman v. Nat'l Sec. Agency, Inc.* 621 F.3d 651, 654 (7th Cir. 2010) (citing *Poer v. Astrue*, 606 F.3d 433, 439 (7th Cir. 2010)). The court construes all facts and reasonable inferences in favor of the nonmoving party, and takes care not to weigh any conflicting evidence. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).


## STATEMENT OF FACTS

The Plaintiff is a leading manufacturer in the instrumentation and controls industry. The Dwyer name is a registered trademark, as are the names of specific products the Plaintiff sells. Among the products the Plaintiff sells are gauges that measure the differential pressure of air and compatible gases. The Plaintiff sells these gauges to original equipment manufacturers and end users, including those in industries that involve heating, ventilation and air conditioning, pollution control, chemicals, food, and oil and gas.

Since 1962, the Plaintiff has been using a lens design on its gauges that incorporates a generally rounded side wall forming a generally domed face with an ornamental design on the lower portion of the lens face that consists of a plurality of horizontal lines and a raised rectangular portion. One of the Plaintiff's most successful and popular product lines, the Series 2000 Magnehelic® brand pressure gauges, has featured this lens design since at least 1963. The Plaintiff uses the same lens on other products it manufactures.

On November 8, 2006, the Plaintiff filed an application with the United States Patent and Trademark Office (USPTO) to register the lens design that it used on pressure gauges and differential pressure gauges. On March 18, 2008, the USPTO issued United States Registration No. 3,397,050 to the Plaintiff under § 1052(f) for the mark (Lens Mark) in connection with pressure gauges and differential pressure gauges. The Lens Mark "consists of a plurality of horizontal lines and a raised rectangular portion on the lens of a pressure gauge." (Trademark, ECF No. 98-4.) By May 2008, the Plaintiff was using the ® symbol in connection with the products bearing the Lens Mark.

In 1997, Kohl began working for the Plaintiff, ultimately reaching the level of District Sales Manager. In his employment for the Plaintiff, Kohl promoted the sale of the Plaintiff's Magnehelic® brand pressure gauges. On July 20, 2005, Kohl resigned from the Plaintiff's employment, and within three weeks incorporated Sensocon. The following year, Kohl contacted a Chinese-based company seeking information on a product "that was identical to the Dwyer Magnehelic that was made by a company called Best Control Technology (in Beijing)." (Email correspondence, ECF No. 102 at 17.) Kohl indicated that he was interested in selling the product in North America. By summer 2006, a different Chinese company, Sailsors, was manufacturing differential pressure gauges for Sensocon. The lens had the same plurality of horizontal lines and a raised rectangular portion that Dwyer uses on its gauges. The face of the gauge, however, included the word SENSOCON, instead of Magnehelic®. In fall 2006, Kohl contacted current customers of the Plaintiff to inform them that Sensocon had an alternative to the pressure gauges they were currently using, specifically a Sensocon model S2000 differential pressure gauge. Sensocon also promoted its products through a website.

In late 2006, the Plaintiff became aware that Sensocon was marketing competitive pressure gauges that the Plaintiff believed incorporated its trademarks without authorization. On January 8, 2007, the Plaintiff sent the Defendants a letter with respect to Sensocon's use of the Plaintiff's Magnehelic® and Dwyer® registered trademarks and Series 2000 common law trademark in marketing and promotional materials. The letter also advised that the Plaintiff was the owner of trademark rights in the trade dress of its Magnehelic® pressure gauges as generally shown in an attached drawing, which showed a gauge with a plurality of horizontal lines covering the bottom portion of the lens and a raised rectangular portion. The letter alleged that the Sensocon S2000 differential pressure gauge incorporated the trade dress of the Plaintiff's Magnehelic® pressure gauge, violated the Plaintiff's trademark rights, and was likely to cause confusion, mistake, and deception of the purchasing public. The Plaintiff requested a written assurance by January 22, 2007, that the Defendants would cease and desist from the identified activities and voluntarily discontinue use of the Plaintiff's marks and trade dress so that future legal action would not be necessary. (Jan. 8, 2007, Letter, ECF No. 104-2 at 23–24.)

The Defendants continued to advertise, promote, and sell the S2000 Sensocon gauge throughout 2008 and 2009. On January 7, 2009, the Plaintiff filed this lawsuit against the Defendants for trademark infringement, trade dress infringement, unfair competition, false designation of origin, and copyright infringement. The Plaintiff later added a claim for counterfeiting.

In 2010, Sensocon began selling gauges with a lens design that did not contain a plurality of horizontal lines and raised rectangular portion (the Third Generation Lens). The Defendants maintain that after December 31, 2009, Sensocon no longer sold the S2000 gauge, but instead

only sold gauges with the Third Generation Lens.

In addition to Sensocon, Kohl has set up another company by the name of TEK Instrument Company (TEK Instrument). TEK Instrument sells gauges that are manufactured by Sensocon. On it website, TEK Instrument advertises and sells the Sensocon Series S2000 differential pressure gauge as the "Series S2000 Differential Pressure Gauge — Magnehelic® Alternative." (TEK Instrument Company web page, ECF No. 108-31).

The Court will provide additional facts throughout the Analysis as they become necessary to resolve the pending Motion.

## ANALYSIS

### A.    Tony Kohl's Personal Liability

In an Opinion and Order issued on March 23, 2012, the Court determined that the Plaintiff had not offered evidence in support of its claim that Kohl was the alter ego of Sensocon. The Plaintiff had presented no evidence that Sensocon was undercapitalized, did not have corporate records, or ignored corporate formalities. The Plaintiff did not cite any evidence to suggest that Kohl commingled his assets and affairs with Sensocon's, used the corporate form to promote fraud, or payed his individual expenses with corporate funds. That holding remains valid for the remaining claims against Kohl, and he cannot be held liable as the alter ego of Sensocon. However, in that same Opinion and Order, the Court found in favor of the Plaintiff on its alternative theory of liability against Kohl—that he was personally liable for trademark infringement because he participated directly in the activities related to the original Sensocon gauge that constituted infringement of the Plaintiff's intellectual property rights in the Lens

Mark. In making this finding, the Court rejected Kohl's argument that the Plaintiff could not proceed under the direct liability theory because Count I of the First Amended Complaint only asserted liability on alter ego grounds. (March 23, 2012, Op. & Order 33–39, EFC No. 125.)

As he did for Count I, Kohl argues that the Plaintiff cannot proceed under the direct liability theory for Counts II, III, IV, VII, and IX of the First Amended Complaint because the Plaintiff only alleged liability under the alter ego theory. For Counts V and VI, which are based on common law, Kohl asserts that Indiana does not recognize claims for personal liability. Finally, regarding Count VIII, Kohl contends that there is no evidence that he personally participated in wrongdoing with respect to the Sensocon Installation and Operation Manual, which is the document that the Plaintiff alleges constitutes copyright infringement.

### 1. *Counts II, III, IV, VII, and IX*

The Court disagrees with Kohl's assertion that the First Amended Complaint does not allege that he was a direct participant in infringing conduct. Paragraph 14 of the First Amended Complaint alleges that Sensocon "through the direction of Kohl" has been selling infringing pressure gauges, and in paragraph 15 alleges that Sensocon, "by direction of Kohl is transacting business and has committed illegal acts hereinafter complained of." (First Am. Compl., ECF No. 52.) In paragraphs 21, 24, and 25, the Plaintiff alleges that both Sensocon and Kohl are distributing and selling pressure gauges, using trademarks in connection with gauges that include a lettering scheme identical to or confusingly similar to the Plaintiff's trademarks, and using a lens identical with, or substantially indistinguishable from and confusingly similar to, the Plaintiff's trademarks. (*Id.*) All of these allegations are then repeated and realleged for each

count. Additionally, under the heading for Count II, the Plaintiff alleges that "SENSOCON and KOHL use or have used the identical mark or a confusingly similar mark in connection with the sale of SENSOCON pressure gauges." (*Id.* ¶ 52.) Then, in paragraph 53, the Plaintiff alleges that Sensocon and Kohl "as its owner, president, director *and* alter ego, have willfully and deliberately infringed." (*Id.* (emphasis added).) The same general pattern of allegations is repeated with respect to Count III of the First Amended Complaint. (*Id.* ¶¶ 63, 64.) Counts IV includes numerous statements with respect to Sensocon and Kohl, with only one paragraph referring to Kohl as the alter ego of Sensocon. Count IX includes many references to Sensocon's and Kohl's actions without reference to alter ego. Only Count VII's references to Kohl are framed solely in terms of him being the alter ego of Sensocon. Nevertheless, the allegations of the First Amended Complaint, when read in their entirety, do not suggest that the Plaintiff was asserting alter ego as the only mechanism by which Kohl was responsible for infringing acts. Kohl is not entitled to summary judgment on his asserted ground that the First Amended Complaint, specifically Counts II, III, IV, VII, and IX, alleges no claims against him personally.

Kohl has not attempted, for these Counts, to show that a reasonable jury could not conclude that Kohl exceeded his corporate officer duties and, as the sole founder, shareholder, and employee of Sensocon, personally participated in the manufacture and sale of the infringing product and directed advertising related to the product. Long ago, the Seventh Circuit adopted a standard for holding a corporate officer liable for direct infringement:

> [I]n the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction. . . . It is when the officer acts willfully and knowingly—that is, when he personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses

an irresponsible corporation with the purpose of avoiding personal liability—that
officers are held jointly with the company.

*Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir. 1926); *see also Grice Eng'g, Inc. v.
JG Innovations, Inc.*, 691 F. Supp. 2d 915, 925 (W.D. Wis. 2010) (citing *Dangler* as "still the
law of the Seventh Circuit for direct patent and trademark infringement claims"); *Syscon, Inc. v.
Vehicle Valuation Servs., Inc.,* 274 F. Supp. 2d 975, 976 (N.D. Ill. 2003) (noting that "*Dangler*
remains the law of this Circuit") (citing *Kohler Co. v. Kohler Int'l, Ltd.*, 196 F. Supp. 2d 690,
694 (N.D. Ill. 2002); *Drink Group, Inc. v. Gulfstream Commc'ns, Inc.*, 7 F. Supp. 2d 1009, 1010
(N.D. Ill. 1998)). It will be for a jury to determine whether this standard has been satisfied and
whether Kohl is personally liable for any violations as set forth in Counts II, III, IV, VII, and IX.


2.      ***Counts V and VII—Common Law Trademark Infringement and Unfair Competition***

        Kohl asserts that he cannot be held personally liable under the Indiana common law
claims for trademark infringement and unfair competition because Indiana does not recognize
such liability for officers of corporations. A review of Indiana law reveals otherwise.

        Unfair competition and trademark infringement are common law torts. *Keaton & Keaton
v. Keaton*, 842 N.E.2d 816, 819 (Ind. 2006); *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598
(Ind. 2001). The Indiana Supreme Court has stated:

        It is true that an officer of a corporation is generally not personally liable for the
        torts of the corporation or other officers or agents merely because of her office.
        However, an officer is personally liable for the torts in which she has participated
        or which she has authorized or directed.

*State Civil Rights Comm'n v. Cnty. Line Park. Inc.*, 738 N.E.2d 1044, 1050 (Ind. 2000) (citations
omitted) (reversing dismissal of claims alleging that individual defendants participated in illegal

discrimination); *see also McDonald v. Smart Prof. Photo Copy Corp.*, 664 N.E.2d 761, 764 (Ind. Ct. App. 1996) ("An agent who fraudulently represents, uses duress, or knowingly assists in the commission of fraud or duress by his principal is subject to liability in tort to any injured third party."); *Am. Indep. Mgmt. Sys., Inc. v. McDaniel*, 443 N.E.2d 98, 103 (Ind. Ct. App. 1982) (holding that the president of a corporation could not escape liability for fraud "by claiming that he acted on behalf of the corporation because an agent is liable for his own torts"). The principal of liability of a corporate officer for torts is not limited, as the Defendants suggest, to cases involving fraud. *See DFX Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 346–47 (7th Cir. 2004) (stating that the well-established principle of Indiana law set forth in *County Line Park* "has been applied not just in common law fraud actions, but in other statutory and common law causes"); *Stillwater of Crown Point Homeowner's Ass'n, Inc. v. Kovich*, 820 F. Supp. 2d 859, 893 (N.D. Ind. 2011) (holding that, under the principle recognized in *County Line Park*, the defendant could not, simply because he was a corporate officer, escape liability for the state law tort claims for negligence per se related to the Indiana Flood Control Act, breach of the restrictive covenants, breach of the implied warranty of habitability, negligence, and nuisance).

The Plaintiff's claims against Kohl are not merely due to his position as a shareholder or an officer within the larger corporate organization. The Plaintiff has presented evidence from which a reasonable jury could conclude that Kohl participated in, authorized, or directed acts that constitute the torts at issue, and Kohl is not entitled to judgment as a matter of law on the grounds raised in his Motion for Partial Summary Judgment.

### 3.      *Count VIII—Copyright Infringement*

With respect to the Plaintiff's claim that Kohl infringed its copyright Infringement, Kohl sets forth a separate argument in support of summary judgment. He argues that the Plaintiff has not made the special showing required under *Dangler* that Kohl personally participated in drafting the installation instructions (Bulletin 103) posted on Sensocon's website. Although Kohl does not dispute that he was Sensocon's founder and sole shareholder and employee, he argues that the Rule 30(b)(6) deposition of Sensocon establishes that the third party manufacturer, Sailsors, "wrote the manual at issue, and it was [Kohl]'s understanding that the third party manufacturer did not copy Dwyer's manual." (Defs.' Reply 5, ECF No. 118 (citing Sensocon Dep. 68, ECF No. 110-3).)

Kohl's reliance on *Dangler* does not acknowledge the specific case law that has developed for copyright cases. The Supreme Court has held that, while "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another . . . [t]he absence of such express language in the copyright statute does not preclude the imposition of liability for copyright infringements on certain parties who have not themselves engaged in the infringing activity." *Sony Corp. of Am. v. Universal City Studios,* 464 U.S. 417, 434–35 (1984) (stating that "vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just to hold one individual liable for the actions of another"). "Vicarious liability exists when two elements are present. First, the defendant must possess the right and ability to supervise the infringing conduct. Second that defendant must have 'an obvious and direct financial interest in the exploitation of copyrighted materials.'" 3 Nimmer on Copyright

§ 12.04[A][2] (quoting *Shapiro, Bernstein & Co. v. H.L. Green, Co.*, 316 F.2d 304, 307 (2d Cir. 1963)). A form of contributory infringement occurs when a "party 'who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another.'" *Id.* § 12.04[A][3][*a*] (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). At least one district court in the Seventh Circuit has acknowledged this, stating that contributory liability is possible where a party "directly participates in the infringing activity or 'induces, causes, or materially contributes to the infringing conduct of another.'" *Microsoft Corp. v. Ram Distrib., LLC*, 625 F. Supp. 2d 674, 682 (E.D. Wis. 2008) (quoting *Burdick v. Koerner*, 988 F. Supp. 1206, 1209 (E.D. Wis. 1998) (quoting *Grupke v. Linda Lori Sportswear, Inc.*, 921 F. Supp. 987, 998 (E.D.N.Y. 1996))).

Although Kohl testified during Sensocon's Deposition that he did not understand Sailsors to have copied Dwyer's installation guide, he also acknowledged that Sensocon had input in the formatting of Bulletin 103, that he corrected the English in a draft of the manual that Sailsors provided, and that he understood that Bulletin 103 was similar to Dwyer's installation guide for the Magnehlic® gauges. (Sensocon Dep. 67–69, ECF No. 110-3.) Kohl's familiarity with Dwyer's installation guide is consistent with his experience in Dwyer's employment selling Magnehelic® gauges. This familiarity, along with the fact that Kohl solicited the manual from Sailsors, edited the draft Sailsors provided, and made the manual available through Sensocon's website, is sufficient for the Plaintiff to create a genuine issue of material fact concerning Kohl's liability for copyright infringement. The fact that Kohl did not "understand Sailsors to have copied Dwyer's installation guide" only speaks to his lack of knowledge of how Sailsor obtained the material for the manual, but does not foreclose a finding that he was willfully blind to

infringing activity. *See In re Aimster Copyright Litigation*, 334 F.3d 643, 650 (7th Cir. 2003) ("Willful blindness is knowledge, in copyright law (where indeed it may be enough that the defendant *should* have known of the direct infringement).").

**B.     Count II—Trademark Infringement of the Magnehelic® Mark; Count IV—Unfair Competition/False Designation of Origin of Magnehelic® Mark and of Pre-Registered Lens Mark**

Count II of the Plaintiff's First Amended Complaint alleges that the Defendants violated 15 U.S.C. § 1114 by using a mark that is identical or confusingly similar to its Magnehelic® Mark in connection with the sale of Sensocon Series S2000 pressure gauges. One example the Plaintiff cited in the First Amended Complaint is a marketing flyer titled "Why should we buy and sell Sensocon Products?" (Flyer). (Flyer, First Am. Compl., Ex. F, ECF No. 52 at 41.)

The Defendants argue that they are entitled to summary judgment on Count II because the Flyer is not infringing. The Defendant note that they used text referring to Magnehelic® in the Flyer to describe the Plaintiff's model Series 2000 gauges, which are not readily identifiable without the Magnehelic® Mark, and argue that this constitutes valid comparative advertising. They assert that, as comparative advertising, the Flyer does not suggest joint sponsorship or endorsement by the Plaintiff, but instead communicates that consumers should buy from Sensocon instead of the Plaintiff.

The Plaintiff argues that the Defendants are mistaken that the only marketing at issue in this litigation is the Flyer. The Plaintiff asserts that, as of April 2011 when it filed its response brief, the Defendant continued to use the Magnehelic® Mark on the Sensocon website, and in connection with the sale of the Sensocon Series S2000 differential pressure gauge through TEK

Instrument. More particularly, the Plaintiff objects to TEK Instrument offering for sale on its website a gauge called the "Series S2000 Differential Pressure Gauge—Magnehelic® Alternative." The Plaintiff asserts that TEK Instrument also sends out invoices for the Sencocon Series S2000 gauge that say "Magnehelic® Alternative," without attributing the Magnehelic® trademark to Dwyer. The Plaintiff notes that on one page of TEK Instrument's webpage, the Defendants use the Plaintiff's Magnehelic® mark more than five times, and argues that "[s]uch rampant use is clearly for the purposes of increasing the Defendants['] webpage search results for MAGNEHELIC, and cannot be said to be reasonably necessary to identify Dwyer's product or to prevent confusion." (Pl.'s Mem. 15, ECF No. 108.)

In reply, the Defendants argue that the Sensocon website is not problematic because it includes the heading "SENSOCON® Series S2000 vs Dwyer® Magnehelic®," followed by a comparison of the gauges and a notice that "Dwyer® and Mangehelic® are registered trademarks of Dwyer Instruments, Inc." (Product Comparison, ECF No. 108-27), and thus clearly conveys that Sensocon and Dwyer are competitors and invites purchasers to compare the different gauges. The Defendants argue that they are not responsible for the actions of TEK Instrument or other third parties and that, in any event, the TEK Instrument website uses the same permissible comparison language and likewise designates Magnehelic® as a registered trademark of Dwyer®.

Count IV of the Plaintiff's First Amended Complaint asserts that the Defendants' use of the Magnehelic® Mark and the Lens Mark in connection with the sale of pressure gauges constitutes false designation of origin or false description or representation in violation of 15 U.S.C. § 1125. The Plaintiff alleges that, in doing so, the Defendants have unfairly competed

with the Plaintiff. In making this claim, the Plaintiff's First Amended Complaint specifically references marketing materials, the installation and operation manual for the S2000 Sensocon differential pressure gauge, and the Flyer titled "Why should we buy and sell Sensocon Products?". (First Am. Compl., Exs. A, B, C & F, ECF No. 52.)

The Defendants argue that the Court should grant them summary judgment on this claim because Sensocon's use of the Magnehelic® Mark in the comparison Flyer is not likely to cause confusion. Rather, they contend, the message of the Flyer is that the consumer should purchase products from Sensocon instead of from the Plaintiff.

In response, the Plaintiff points to the Defendants' use of the Magnehelic® Mark on Sensocon's webpages, in TEK Instrument's offering of a "Series S2000 Differential Pressure Gauge — Magnehelic® Alternative," and on invoices. In their Reply, the Defendants address their use of the Magnehelic® Mark in the Flyer and on Sensocon's website, arguing that the use is not likely to raise concerns regarding sponsorship by or affiliation with the Plaintiff, and is not likely to cause confusion. In a footnote, the Defendants also point out that the gauges at issue are not identical. The Defendants make reference to the TEK Instrument advertisement, arguing that it "clearly designates that Dwyer is the source of the Magnehelic brand gauge, not Sensocon." (Defs.' Reply 11 n.7, ECF No. 118.) In addition, the Defendants argue that they are not responsible for the actions of TEK Instrument because it is an unnamed third party. With regard to the Lens Mark, the Defendants argue that the Plaintiff cannot recover damages for the Defendants' use of the Lens Mark before January 14, 2009, because that is the date when the Plaintiff gave them notice of the registration by way of filing its lawsuit. The Defendants argue that no damages are recoverable after December 31, 2009, because they began using the Third

Generation Lens, which was not alleged in the First Amended Complaint to be an infringement of the Plaintiff's Lens Mark.

The Plaintiff's claim for trademark infringement of its Magnehelic® Mark, Count II, is governed by 15 U.S.C. § 1114, which provides a civil remedy for the registrant of a registered trademark against any person who,

> without the consent of the registrant . . . use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1)(a). To prevail on its trademark infringement claim, the Plaintiff must establish that its mark is protectable and that the Defendants' unauthorized use of the mark was likely to cause confusion among consumers. *CAE, Inc. v. Clean Air Eng'r, Inc.*, 267 F.3d 660, 673–74 (7th Cir. 2001) (citing *Eli Lilly & Co. v. Natural Answers, Inc.*, 223 F.3d 456, 461 (7th Cir. 2000); *Smith v. Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir. 1993)).

Section 1125(a), which is the asserted basis for recovery in Count IV, governs infringement of unregistered marks. *See Two Pesos, Inc v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 502 (7th Cir. 1992). A claim of false designation of origin or sponsorship under § 1125 requires a plaintiff to demonstrate that a defendant:

> (1) use[d] in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A). Thus, as with a trademark infringement claim, a plaintiff must show that: "(1) the defendants have a protectable trademark; and (2) a 'likelihood of confusion' will exist as to the origin of the plaintiff's products." *Johnny Blastoff, Inc. v. L.A Rams Football Co.*, 188 F.3d 427, 435–36 (7th Cir. 1999); *see also Packman v. Chi. Trib. Co.*, 267 F.3d 628, 638 & n.8 (7th Cir. 2001) (noting that proof of protectable mark and defendant's use of the mark likely to cause confusion among consumers is required for both trademark infringement and unfair competition).

### 1.    *Protectable Marks*

The Defendants do not dispute that Magnehelic® has been a registered trademark of the Plaintiff for pressure gauges since 1960. With respect to the Lens Mark, the Defendants take issue with the Plaintiff's claims for damages under § 1125(a) on grounds that the Defendants did not have "actual notice" of the registration of the Lens Mark until January 14, 2009, when the Plaintiff filed its Complaint. The Defendants' argument relies on a section of the Lanham Act that states:

> [A] registrant of a mark registered in the Patent and Trademark Office, may give notice that his mark is registered by displaying with the mark the words "Registered in U.S. Patent and Trademark Office" or "Reg. U.S. Pat. & Tm. Off." or the letter R enclosed within a circle, thus ®; and in any suit for infringement under this chapter by such a registrant failing to give such notice of registration, no profits and no damages shall be recovered under the provisions of this chapter unless the defendant had actual notice of the registration.

15 U.S.C. § 1111. According to § 1117(a), a violation of any right of the registrant of a mark registered in the USPTO or any violation under § 1125(a) entitles the plaintiff to recover the defendant's profits, damages sustained by the plaintiff, and costs of the action, subject to the

provisions of § 1111. 15 U.S.C. § 1117(a).

The Defendants' argument does not compel summary judgment in their favor. Section 1111 permits holders of registered trademarks to use the ® symbol or certain language to provide notice to others of its registration. Only when the mark holder fails to "give such notice of registration," 15 U.S.C. § 1111, either by displaying the ® with the mark or printing one of the other notices near the mark, are damages in an infringement action then limited to situations where the defendant had "actual notice of the registration," *id.* The Plaintiff began using the ® symbol in connection with the lens design in May 2008. Count I of the Plaintiff's First Amended Complaint, a claim for trademark infringement under § 1114, is directed at the Defendants' use of the Lens Mark after May 2008. The claim of infringement of the lens design before it was registered comes within Count IV's § 1125(a) claim. The limitation in § 1111 does not apply to Count IV. As one treatise author explains:

> Since 1989, [§ 1117] statutory damages for a violation of [§ 1125(a)] for infringement of an unregistered mark are "subject to" the provisions of the [§ 1111] requirements of notice. But because the [§ 1111] requirement of notice only applies to registered marks, it is, of course, not a limitation on recovery of damages under a [§ 1125(a)] count for infringement of an unregistered mark.

3 *McCarthy on Trademarks & Unfair Competition* § 19:144 (4th ed.). This Court agrees that the notice language of § 1111 only applies to registered marks and to claims for infringement of such registered marks. It would have been improper and incorrect for the Plaintiff to notify the Defendants that the design of its lens was registered before the actual date of registration.[1]

---

[1] The Plaintiff did give the Defendants notice on January 8, 2007, by way of a cease and desist letter, that it was the owner of trademark rights in the trade dress of its Magnehelic® pressure gauges as generally shown in an attached drawing, which showed a gauge with a plurality of horizontal lines covering the bottom portion of the lens and a raised rectangular portion. The letter alleged that the Sensocon S2000 differential pressure gauge incorporated the trade dress of the Plaintiff's Magnehelic® pressure gauge and violated the Plaintiff's trademark rights. In addition, Kohl worked for the Plaintiff

McCarthy goes on to note:

> The more problematic question is whether a registrant who proves infringement under both [§ 1114(1)] (registered mark) and [§ 1125(a)] (unregistered mark) can avoid the notice limitation imposed by [§ 1111] by claiming all of its damages fall under the [§ 1125(a)] count. A strict reading of the statutory language of [§ 1111] would, in the author's opinion, lead to the conclusion that such a registrant cannot avoid the [§ 1111] damage limitation by using [§ 1125(a)]. Section [§ 1111] does not distinguish between the kind of statutory infringement that a registrant proves. Rather, [§ 1111] simply states that no profits and damages shall be recovered "under the provisions of this Act" unless statutory or actual notice was given.

*Id.* Here, the Plaintiff has not attempted to claim all of its damages under § 1125(a) or otherwise used § 1125(a) in an attempt to avoid the damage limitation. Rather, the Plaintiff asserted a violation of § 1125(a) as the mechanism to recovery for infringement that occurred before the design of its lens was registered as a trademark. Under these circumstances, the Court finds that the Plaintiff is eligible to recover damages for any infringement under 15 U.S.C. § 1125(a) that occurred before the lens mark was registered, and may do so without reference to § 1111. *See, e.g., GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 306 (S.D.N.Y. 2002) (stating that the plaintiff could recover damages for any infringement that occurred before the date of the mark's registration under 15 U.S.C. § 1125(a) but that for infringement occurring after the date of the registration the plaintiff has to satisfy the notice requirements of § 1111 to recovery profits and damages); *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 912 (E.D.N.Y. 1988) (stating that absence of statutory notice was not relevant to claim under § 1125 because registration was not a prerequisite to the cause of action).

In their Motion for Partial Summary Judgment, the Defendants' only challenge to the

---

from 1997 to 2005, where he promoted the sale of the Plaintiff's Magnehelic® brand pressure gauges, and he was thus familiar with its design.

Plaintiff's ability to pursue a claim under § 1125(a) for the Defendants' use of the Lens Mark is their argument that the Defendants did not have actual notice of registration. The Defendants have not designated any evidence or advanced any argument concerning whether the Plaintiff had a protectable trademark interest in the plurality of horizontal lines and raised rectangular portion, and the Court assumes for purposes of summary judgment that the issue is not in dispute. The Plaintiff will bear the burden of proving at trial its protectable interest in the lens design prior to its registration of the Lens Mark.[2]

**2.** *Likelihood of Confusion—Magnehelic® Mark*

The Defendants' Motion for Partial Summary Judgment raises a defense for their use of Magnehelic® that implicates the likelihood of confusion prong of a trademark infringement claim. A statutory "fair use" defense allows a defendant to avoid liability even where the plaintiff has proven likelihood of confusion and the other elements of a prima facie case of infringement. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 124 (2004); 15 U.S.C. § 1115(b)(4) (creating an affirmative defense to a claim of infringement where the name "charged to be an infringement is a use, otherwise than as a mark . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin"). The Defendants, rightly, do not attempt to rely on this affirmative defense, which would not apply because "Magnehelic" is not descriptive

---

[2] The Court already determined that the Lens Mark is protectable in the context of the claim for trademark infringement pursuant to 15 U.S.C. § 1114. This finding was not an explicit ruling on the protectability of the trademark prior to its registration despite the fact that "the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § [1125(a)]." *Two Pesos*, 505 U.S. at 768.

of Sensocon's product or its geographic origin. Instead, the Defendants rely on the "nominative fair use" defense that was first recognized by the Ninth Circuit in situations where a defendant uses the plaintiff's trademark to describe the plaintiff's product. "The nominative fair use analysis acknowledges that it is often virtually impossible to refer to a particular product for purposes of comparison, criticism, point of reference or any other such purpose without using the mark." *Horphag Research Ltd. v. Pellegrini*, 337 F.3d 1036, 1041 (9th Cir. 2003) (quoting *Brother Records, Inc. v. Jardine*, 318 F.3d 900, 908 (9th Cir. 2003) (quoting *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 306 (9th Cir. 1992))) (quotation marks omitted); *see also Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 154 (4th Cir. 2012) (noting that "[u]nlike the typical infringement fact-pattern wherein the defendant passes off another's mark as its own and confuses the public as to precisely whose goods are being sold, a nominative use is one in which the defendant uses the plaintiff's trademark to identify the plaintiff's own goods") (citing *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 217 (3d Cir. 2005); *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010)) (brackets, quotation marks, and citations omitted). Nominative fair use is only available "if the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one." *Horphag*, 337 F.3d at 1041 (quoting *Brother Records*, 318 F.3d at 908, (quoting *New Kids*, 971 F.2d at 307–08)) (quotation marks omitted)). The Ninth Circuit has identified three factors to determine whether a defendant is entitled to the nominative fair use defense:

> (1) the product must not be readily identifiable without use of the mark; (2) only so much of the mark may be used as is reasonably necessary to identify the product; and (3) the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*Id.* (citing *New Kids*, 971 F.2d at 308). Although the Ninth Circuit's approach has not been universally adopted, several courts have recognized that, "[i]n the context of a referential or nominative type of use, the application of the traditional multi-factor test is difficult because often many of the factors 'are either unworkable or not suited or helpful as indicators of confusion in this context.'" *Rosetta Stone*, 676 F.3d at 154 (quoting *Century 21*, 425 F.3d at 224); *see id* at 155 (clarifying that it was not "adopting a position about the viability of the nominative fair-use doctrine as a defense to trademark infringement or whether this doctrine should formally alter our likelihood-of-confusion test in some way"). *See also* 4 *McCarthy on Trademarks* § 23:11 (noting that the Ninth Circuit's nominative fair use "elements can be restated in terms of factors to determine if there is a likelihood of confusion" and are an "alternative to the standard multi-part tests used to determine if there is a likelihood of confusion"). For example, as stated by the Fourth Circuit in *Rosetta Stone*, the similarity of the marks and the strength of the plaintiff's mark are of limited value in such cases:

> Consideration of the similarity of the marks will *always* suggest the presence of consumer confusion—the mark used will always be *identical* "because, by definition, nominative use involves the use of *another's* trademark in order to describe the trademark owner's *own* product." *Century 21*, 425 F.3d at 224. The similarity factor does not account for context and "leads to the incorrect conclusion that virtually all nominative uses are confusing." *Playboy Enters.,* [*Inc. v. Welles,*] 279 F.3d [796,] 801 [(9th Cir. 2002)].

676 F.3d at 154 (brackets and citations omitted). In addition, the strength of the mark is often not informative as to confusion where the defendant is not passing off its products under the plaintiff's mark but using the plaintiff's mark to refer to the plaintiff's own products. *Rosetta Stone*, 676 F.3d at 154–55.

The Seventh Circuit has not ruled on the applicability of the nominative fair use defense,

and has not referenced it even in the context of a defendant's use of a mark to describe the plaintiff's product. *See August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 618 (7th Cir. 1995) (stating that in the context of the defendant's use of a competitor's trademark on candy packaging to compare sugar levels that "use of a rival's mark that does not engender confusion about the origin or quality . . . is permissible") (citing *Prestonettes Inc. v. Coty,* 264 U.S. 359 (1924); *Saxlehner v. Wagner*, 216 U.S. 375 (1910); *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500 (8th Cir. 1987); *G.D. Searle & Co. v. Hudson Pharm. Corp.*, 715 F.2d 837 (3d Cir. 1983)). In *August Storck*, the Seventh Circuit considered the defendant's use of the plaintiff's mark to be comparative advertising, and noted that it was beneficial to consumers because they could "learn at a glance what kind of product is for sale and how it differs from a known benchmark." 59 F.3d at 618.

Both the Plaintiff and the Defendants cite to the Ninth Circuit's test in their briefs before this Court and, in doing so, do not explicitly address the Seventh Circuit's seven-factor test. The Defendants argue that they have satisfied the Ninth Circuit's nominal fair use test. The Plaintiff argues that the Defendants could have provided a product comparison without the multiple use of its trademark, and that the Defendants' use suggests sponsorship or endorsement by the Plaintiff because customers familiar with the Plaintiff's Magnehelic® mark would "only assume that the advertised products are endorsed or sponsored by Dwyer because the MAGNEHELIC mark has become associated with Dwyer through Dwyer's extensive sales and advertising of the mark." (Pl.'s Mem. 15–16, ECF No. 108.)[3] Taking into account the various relevant factors from

_____

[3] Although the Plaintiff does not articulate its argument as such, these statements can be construed as going to two of the factors from the traditional multi-factor test: similarity of the marks and strength of the mark. However, as noted above, these elements may be of limited probative value where the defendant is using the plaintiff's mark to refer to the plaintiff's own product.

the Seventh Circuit's test,[4] modified for nominative fair use in the context of comparative advertising, the Court considers whether the Plaintiff has presented evidence from which a jury could find that the Defendants' use of its Magnehelic® Mark is likely to confuse consumers as to the source of the Defendants' product, keeping in mind that the inquiry is fact intensive and that the Court must construe the facts most favorably to the nonmoving party.

a.    Flyer: "Why should we buy and sell Sensocon Products?"

The Defendants used the Plaintiff's Mark one time on the Flyer, stating that its Series S2000 is a "direct replacement to the Dwyer Series 2000 (Magnehelic)." (Flyer, ECF No. 52 at 41.) The Plaintiff asserts that the Defendants could have provided a comparison without using its trademark, but does not state how the Defendants could have accomplished this, as the Magnehelic® brand is not readily identifiable without the use of the Magnehelic® mark. When making reference to the Dwyer® Magnehelic® the Defendants do not use distinctive font, typeface, or lettering unique to the Plaintiff's mark, and thus do not use more of the Mark than is reasonably necessary to identify the Plaintiff's product. The Flyer uses the Magnehelic® mark only to convince readers to buy Sensocon Products instead of the Plaintiff's product. The Plaintiff offers no examples of actual confusion as a result of the Flyer, no evidence that the

_____

[4] The Seventh Circuit's traditional multi-factor equitable balancing test for determining likelihood of confusion involves the following factors:

> (1) similarity between the marks in appearance and suggestion; (2) similarity of the products;
> (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by
> consumers; (5) the strength of the plaintiff's mark; (6) whether actual confusion exists; and
> (7) whether the defendant intended to "palm off" his product as that of the plaintiff.

*CAE, Inc.*, 267 F.3d at 677–78 (citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897–98 (7th Cir. 2001)).

Defendants intended to palm the Plaintiff's product off as their own, no facts suggesting that consumers reading about the product comparisons are unlikely to use care in determining the source of the gauges, and no details regarding where or how the Flyer was observed by potential customers. In fact, the Defendants claim that, as a result of the cease and desist letter, they never distributed the Flyer and the Plaintiff has not presented evidence to dispute this fact. For these reasons, the Court finds that the Plaintiff has not identified facts from which a reasonable jury could find that the Defendants used the Plaintiff's Magnehelic® mark in the Flyer in a manner that was likely to cause confusion.

b.     Sensocon Website

Sensocon's website informs viewers that Sensocon gauges may by used in applications where the "Dwyer® Magnehelic® brand gages may be used" (Product Comparison, ECF No. 108-27), and contains a one-page comparison of the two brands. The website states that all information regarding Dwyer® Magnehelic® gauges is based on information taken from Dwyer's catalog, and attributes the marks to Dwyer Instruments, Inc. After the comparison of the two brands, Sensocon states that it will beat any price quoted for the Plaintiff's Magnehelic® brand gauge quoted or invoiced by Dwyer Instruments. This manner of use evidences competition, not sponsorship or endorsement. The Plaintiff offers no examples of actual confusion as a result of the Sensocon website, evidence that the Defendants intended to palm the Plaintiff's product off as their own, or facts suggesting that consumers reading about the product comparisons are unlikely to use care in determining the source of the gauges. Although the products, intended customers, and the channels of trade are the same, persons viewing the

Defendants' use of the Magnehelic® Mark on the Sensocon website will only do so in the context of a clear attempt to compare and distinguish the Plaintiff's product from Sensocon's product and gain a sale for Sensocon.

The Plaintiff submits, without any legal analysis, that the Defendants' rampant use of its Mark is for the purposes of increasing the Defendants' webpage search results for Magnehelic. This reference to Internet advertising implicates the discussion in *Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808 (7th Cir. 2002), regarding initial interest confusion. In *Promatek*, the defendant placed the plaintiff's trademark in its metatag, thereby diverting web consumers to the defendant's website. *Id.* at 812. The court held that this was a misappropriation of the plaintiff's goodwill even if the consumers were no longer misled once they reached the defendant's website. *Id.* ("[T]hat confusion as to the source of a product or service is eventually dispelled does not eliminate the trademark infringement which has already occurred.") (quoting *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 n. 2 (7th Cir. 1990)); *see also Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 382 (7th Cir. 1996) (explaining that initial interest confusion is actionable under the Lanham Act and occurs when a competitor gets its foot in the door by confusing consumers with the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated). The *Promatek* court explained that using another's trademark in metatags was much like posting a sign with another's trademark in front of a store. *Id.* at 813 ("Customers believing they are entering the first store rather than the second are still likely to mill around before they leave.") (citing *Brookfield Comm'ns, Inc. v. W. Coast Entm't Corp.,* 174 F.3d 1036, 1064 (9th Cir. 1999)); *cf. Eli Lilly & Co.*, 233 F.3d at 465 (noting that the defendant's references to the plaintiff's trademark (PROZAC®) in its website

source codes was evidence of wrongful intent to divert Internet users searching for information on PROZAC® to the defendant's website). The court found that the danger of initial interest confusion that applied to terms used in metatags also applied to terms used on websites. 300 F.3d at 813.[5]

Initial customer confusion could thus exist if the Defendants' repeated use of the Magnehelic® Mark on websites selling Sensocon products caused consumers who were looking for the Plaintiff's product to visit the Defendants' website under the mistaken impression that it was a site where Magnehelic® gauges were offered for sale—even if these potential buyers then saw Sensocon's attempt to define its product as an alternative to the Plaintiff's Magnehelic® and realized that the Plaintiff did not sponsor or endorse the Defendants' product. However, in an infringement action, the Plaintiff bears the burden of proving likelihood of confusion, and the Plaintiff has not presented any evidence to suggest that, even if the Defendants intended to increase Sensocon's Internet traffic through search results for Magnehelic, any such purpose was successful achieved. For example, the Plaintiff has not designated any evidence that individuals who conduct website searches containing the word Magnehelic have been or will be directed to websites offering the Defendants' products instead of to the Plaintiff's website or authorized dealer websites. "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640–41 (7th Cir. 2008) (quotation marks omitted). Here, there is

_____

[5] Additionally, as one district court noted, "modern search engines make little if any use of metatags." *Standard Process, Inc. v. Banks*, 554 F. Supp. 2d 866, 871 (E.D. Wis. 2008) (quoting 4 *McCarthy on Trademarks & Unfair Competition* § 25:69 (4th ed. 2003)). Instead of relying on keywords manipulated by webmasters, which became an increasingly poor indicator of relevancy, search engines now primarily use algorithms that rank a website by the number of other sites that link or point to it. 554 F. Supp. 2d at 871 (citing 4 *McCarthy on Trademarks* § 25:69).

no evidence from which a reasonably jury could find that the Defendants' use of the Magnehlic®

Mark on the Sensocon website created customer confusion, initial or otherwise.

c.        Other Websites

The TEK Instrument website lists a product referred to as a Magnehelic® Alternative.

Because this use of the Plaintiff's Mark is not an attempt to describe the Plaintiff's product, but

names, describes, and identifies the Defendants' product, it does not present a nominative fair

use scenario. *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002) ("The

nominative fair use analysis is appropriate where a defendant has used the plaintiff's mark to

describe the plaintiff's product"); *New Kids*, 971 F.2d at 308 (holding that it was legal to use a

senior user's trademark in a non-confusing way to identify the senior user's goods); *McCarthy*

§ 23:11 (describing nominative fair use as the "use of another's trademark to identify, not the

defendant's goods or services, but the plaintiff's goods or services"). The Plaintiff has gone

beyond comparing its product to the Plaintiff's Magnehelic® and used the Plaintiff's mark in a

manner that suggests it is part of the name of the Defendants' product. Although the website

attributes the mark to Dwyer Instruments, Inc. (Product Descriptions, ECF No. 108-31), it does

not do so on every page where the mark appears. Further, even with the ascription to Dwyer, it is

not obvious from viewing the website whether Dwyer is associated with TEK Instrument or

Sensocon, or has endorsed the products. Neither does the information that the "Series S2000 may

be used in all applications where the Dwyer® Magnehelic® brand gages may be used" clarify

that the two gauges are not from the same source. (*Id.*) A reasonable consumer could believe that

the Plaintiff manufactured alternatives to its own products in an attempt to increase market share.

The products serve an identical function and are sold through the same channels of trade. Merely stating that Magnehelic® is a registered trademark of the Plaintiff does not fully reflect the relationship between the Plaintiff's and the Defendants' products, particularly where the name of the Sensocon product includes the Plaintiff's trademark and nothing alerts potential customers that Dwyer does not make or license the Magnehelic® Alternative. The Plaintiff's submissions establish genuine issue of material fact whether this use of the Plaintiff's mark creates a likelihood of confusion.

The Defendants assert that they cannot be held liable for the alleged acts of infringement on the webpage of TEK Instrument because it is not a party to this suit. The designated evidence shows that Kohl is the sole shareholder of TEK Instrument and that it has no other employees, officer, directors, board members, or owners. To the extent that Kohl participated directly in the activities that the Plaintiff claims constitute infringement of its intellectual property rights on the TEK Instrument website, the Plaintiff may proceed against him.

d.      Invoices

Invoices from TEK Instrument refer to "Series S2000 Differential Pressure Gauge—Magnehelic® Alternative" without attributing the mark to the Plaintiff. Viewing the facts in the light most favorable to the Plaintiff, and for the reasons stated above regarding the inclusion of the Plaintiff's mark in the name of the Defendants' product, a reasonable finder of fact could conclude that the Defendants' conduct suggests sponsorship or endorsement by the Plaintiff.

### 3. *Limits on Recovery for Trademark Infringement Involving the Lens Mark*

The Defendants seek a summary judgment ruling limiting the damages the Plaintiff may recover. They assert that the Plaintiff cannot recover damages for any alleged infringement that occurred after December 31, 2009, because it is the last date the Defendants sold any gauges with a plurality of horizontal lines and a raised rectangular portion. Instead, the Defendants began selling Sensocon's Third Generation Lens gauges, which do not have a plurality of horizontal lines or a raised rectangular portion. The Plaintiff counters that the Defendants continued, after December 31, 2009, to "contribute to infringement and commercially benefit from" its first generation lens. As evidence, the Plaintiff points to the webpages for certain Sensocon customers and for Jupiter Electronics, a distributor of Sensocon, who continue to advertise gauges with the original lens design. These webpages are provided as Exhibits AA and BB to the Plaintiff's response. In the Declaration of Budny, he states that Exhibit AA is true and accurate copies of

> relevant website pages, easily accessible from within the United States, located at http://www.walesinst.com/seses2.html (viewed April 18, 2011), http://www.autocalsystems.com/MAGNEHELIC%20GAUGE.htm (viewed April 21, 2011), http://www.icoolsmart.com/sensocon/seriesS2000.htm (viewed April 13, 2011), and http://www.status-automation.com/products_sensocon.html (Viewed April 18, 2011), depicting the continued use of the Sensocon gauge with the first generation lens to advertise Sensocon gauges and http://www.eeprocess.com/STORE/item330.htm (viewed April 18, 2011), depicting the continued use of the Sensocon gauges with the second generation lens to advertise Sensocon gauges.

(Budny Declaration ¶ 24, ECF No. 108-3.) With respect to Exhibit BB, he states that it is true and accurate copies of website pages, located at http://jupiterelectronics.com/low-cost-differential-pressure-guage.html, which depicts that the first generation lens Sensocon gauges are still being advertised for sale by Jupiter Electronics. (*Id.* ¶ 25.) Budny stated he last visited the

site on April 15, 2011. The Plaintiff asserts that the Defendants "have every reason to know that their customers are advertising Defendants' differential pressure gauges with the Defendants' first generation lenses." (Pl.'s Mem. 9, ECF No. 108.) The Plaintiff further notes that the websites are readily available and claims that it would be "bad business practice" for the Defendants not to review the websites of their major customers for infringing product. Kohl testified during the Rule 30(b)(6) deposition of Sensocon, conducted on June 29, 2010, that its distributor, Jupiter, was no longer selling gauges with the original S2000 lens design, but he did not know if he informed his distributors that they were no longer entitled to use that lens design in marketing. (Sensocon Dep. 139, ECF No. 110-3.) In addition, upon being shown a copy of Jupiter's web pages with the Sensocon gauges, Kohl testified that he was not aware of the content of Jupiter's website. (*Id.* 140.)

The Plaintiff argues that the Defendants may be held liable for the infringing acts of distributors under the reasoning set forth by the Supreme Court in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 854 (1982). The Defendants disagree, and argue that *Inwood* does not support the Plaintiff's claim. In *Inwood Laboratories*, the Court confirmed that contributory infringement is actionable as follows:

> [L]iability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another. Even if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their infringing activities under certain circumstances. Thus, if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit.

*Inwood Labs.*, 456 U.S. at 853–54 (citing *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526 (1924); *Coca–Cola Co. v. Snow Crest Bevs., Inc.*, 64 F. Supp. 980 (D. Mass. 1946)).

Thus, under *Inwood Laboratories*, a defendant can be contributorially liable if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement. Here, too many questions remained unanswered by the designated evidence and the parties' briefs to determine whether the Defendants were contributorially responsible for the actions of Jupiter and others. Kohl states that Jupiter no longer sold gauges with the original lens design after December 31, 2009, but he provides no basis for his personal knowledge of Jupiter's sales. There is no mention in the record whether it was possible Jupiter had an inventory of the gauges that preceded the Third Generation Lens, and no explanation why it was still using pictures of the old lens design in April 2011, more than a year after the Defendants claim they were no longer selling the product, and almost a year after Kohl was alerted during a deposition that Jupiter's website contained potentially infringing material. The parties do not address in any detail whether the marketing by Jupiter and others induced sales. The Plaintiffs, however, do present evidence that some of the orders placed by customers in 2009 were not completed until 2010, and the Defendants have not disputed this evidence for purposes of summary judgment. The Defendants are not entitled to summary judgment on the defense that the Plaintiff cannot recover damages after January 1, 2010, because the Plaintiff no longer sold the original S2000 gauge. That issue is better suited for resolution by a fact finder after trial.

Additionally, the Plaintiff maintains that liability does not end with the Third Generation Lens because it too infringes the Plaintiff's Lens Mark. The Plaintiff asserts that although its First Amended Complaint does not specifically refer to the Third Generation Lens, it nevertheless encompasses claims related to the Third Generation Lens through the allegation that Sensocon and Kohl were using "a pressure gauge lens identical with, substantially

indistinguishable from and confusingly similar to the Registered Lens Mark in connection with SENSOCON pressure gauges." (First Am. Comp. ¶ 35.) According to the Plaintiff, it was not required to identify the specific model, or to supplement its pleading every time the Defendant changed its design. The Plaintiff notes, also, that the parties have conducted this litigation as though the Third Generation Lens were at issue, and thus it is has been raised by implied consent as authorized by Federal Rule of Civil Procedure 15(b)(2).

The Defendants disagree. They assert that the Plaintiff's did not plead liability with respect to the Third Generation Lens because that lens does not have a plurality of horizontal lines and a raised rectangular portion, which is the description of the registered Lens Mark. They assert that the Plaintiff cannot rely on Federal Rule of Civil Procedure 15(b) to include the Third Generation Lens because that Rule only applies to issues that are "tried," and there has been no trial in this case. In addition, the Defendants note that, although the Plaintiff maintains that it could simply seek leave to amend if the Court requires it, no such motion is before the Court and the time for amending the pleadings has long since passed, discovery is closed, and dispositive motions are fully briefed.

The Plaintiff's First Amended Complaint alleges that the Defendants use a pressure gauge with a lens that is identical with, substantially indistinguishable from, and confusingly similar to its registered Lens Mark. The First Amended Complaint refers specifically to the Series S2000 and Series P2000 gauges and the modified version of these gauges, and includes pictures. The First Amended Complaint does not give notice to the Defendants that the Plaintiff considers its Third Generation Lens to also be identical with, substantially indistinguishable from, and confusingly similar to its registered Lens Mark. Indeed, it would have been impossible

for the Plaintiff to specifically identify the modified Third Generation Lens, as Sensocon did not begin to market and sell it until after the Plaintiff drafted the First Amended Complaint.

The Plaintiff invokes Rule 15(b)(2) as a basis to allow its trademark infringement claim to include the Defendants' manufacture and sale of gauges with the Third Generation Lens. But Rule 15(b)(2) applies to amendments during and after trial, permitting the amendment of a complaint if "issues not raised by the pleadings are tried by express or implied consent." This matter has not been to trial and the issues related to the Third Generation Lens have not been raised by consent, as evidenced by the Defendants' objection to including the Third Generation Lens in a discussion of trademark infringement. A separate subsection of Rule 15 provides that upon "motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). When a supplemental pleading facilitates the efficient administration of justice, a court should allow it. *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 226–27 (1964). A supplemental pleading should be denied under Rule 15(d) if there is "any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Glatt v. Chi. Park Dist.*, 87 F.3d 190, 194 (7th Cir. 1996) (citing *Foman* factors and stating that the standard whether to allow a supplement to pleadings under Rule 15(d) is the same as that used to determine motions to amend under 15(a)). Because there is no motion to supplement pending before the Court and no discussion of the *Foman* factors in the existing summary

judgment briefs, the Court makes no determination whether it would permit the Plaintiff to supplement its pleadings in this lawsuit. Because the First Amended Complaint did not put the Defendants on notice that the Plaintiff believes the design of the Third Generation Lens, which does not contain a plurality of horizontal lines or raised rectangular portion, infringes on its trademark, the Plaintiff's trademark claim cannot be based on the Third Generation Lens. For reasons stated above, however, even without the inclusion of sales for the Third Generation Lens the Defendants are not entitled to a judgment that the Plaintiff incurred no damages after December 31, 2009.

## C. Count III—Trademark Infringement of the Dwyer® Mark

The Defendants contend that the Plaintiff's counsel informed the Defendants' counsel that the Plaintiff would no longer be pursing the claim that the Defendants infringed on the Plaintiff's trademark in the Dwyer® name. In response, the Plaintiff admits that it informed the Defendants that it would not be pursuing Count III and would not rely on the Dwyer® mark in connection with any other count of the First Amended Complaint. (Pl.'s Mem. 1 n.1, ECF No. 108.) The Court therefore grants the Defendants' request for judgment as a matter of law on Count III.

## D. Count V—Common Law Trademark Infringement/False Designation of Origin for Series 2000

Count V of the First Amended Complaint alleges that the Defendants' use of "Series S2000" and "Series P2000" in connection with pressure gauges infringes on the Plaintiff's common law "Series 2000" mark and violates 15 U.S.C. § 1125. As mentioned above, a

35

successful § 1125 claim requires that the plaintiff have a protectable mark. The Defendants argue that they are entitled to summary judgment on this claim because Series 2000 is a model series number that has not acquired secondary meaning and thus is not entitled to trademark protection. The Plaintiff contends that because Series 2000 is not a model number it does not require secondary meaning to enjoy common law trademark protection and that, in any event, it has acquired such meaning.

The USPTO Trademark Trial and Appeal Board has stated that an alphanumeric term that is used only to designate model, style, or grade (serving as a means to distinguish quality, size, or type) is not registrable. *In re Dana Corp.*, 12 U.S.P.Q.2d 1748, 1749 (1989) (stating that "such a designation serves as a description of the product"). "Model numbers, while often arbitrary in that they do not refer to characteristics of the item they demark, are nevertheless generally descriptive because they serve to distinguish a single source's products from each other." *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir. 1995); *see also J.M. Huber Corp. v. Lowery Wellheads, Inc.*, 778 F.2d 1467, 1469–70 (10th Cir. 1985) (although alphanumeric symbols on wellheads do not describe wellheads' physical characteristics, "symbols distinguish one [company] wellhead from another"); *see generally Platinum Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 727 (7th Cir. 1998) ("A descriptive mark is one that describes the ingredients, qualities, or characteristics of an article of trade or a service and, generally, it is not protected as a trademark because a merely descriptive mark is a poor means of distinguishing one source of services from another.") (quoting *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986) (quoting *M.B.H. Enters. v. WOKY, Inc.*, 633 F.2d 50, 54 (7th Cir.1980))) (quotation marks omitted)). These types of terms are treated the

same as other merely descriptive terms. *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 865 (7th Cir. 1983); *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1022 (7th Cir. 1979). Therefore, depending on the nature and use of such a number, it is capable of becoming a trademark if it acquires secondary meaning. *Ideal Indus.*, 612 F.2d at 1022–23; *see also Two Pesos*, 505 U.S. at 769 (holding that marks that are merely descriptive of a product are not inherently distinctive, but may acquire distinctiveness that allows them to be protected).

Secondary meaning occurs when, "in the minds of the public, the primary significance of a mark is to identify the source of the product rather then the product itself." *Wal-Mart Stores, Inc. v. Samara Bros., Inc*, 529 U.S. 205, 211 (2000) (quoting *Inwood Labs.*, 456 U.S. at 851 n.11 (brackets omitted)); *see Qualitex v. Jacobson Prods. Co.*, 514 U.S. 159, 163 (1995). Secondary meaning arises when a mark "has been used so long and so exclusively by one company in association with its goods or services that the [design] has come to mean that those goods or services are the company's trademark." *Packman*, 267 F.3d at 641. It is not necessary that the public be aware of the identity of the producer, just that the public associate the trade dress with a single source. *Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1266–67 (7th Cir. 1989). The Seventh Circuit considers the following six factors in determining whether a mark has acquired secondary meaning: (1) direct consumer testimony and consumer surveys; (2) exclusivity, length and manner of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) established place in the market; and (6) proof of intentional copying. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992); *Echo Travel*, 870 F.2d at 1267.

In support of the claim that Series 2000 is not a model number, and thus not descriptive, the Plaintiff offers the statements of Budny, including his statements that Series 2000 does not designate a size, aspect, or other characteristic of the Plaintiff's differential pressure gauges, that it is a randomly selected designation given to one line of the Plaintiff's gauges, that it was never intended as a model number, and that it has been used in a different type font, set off apart from other words or trademarks, and set in bold font. The Defendants argue that even arbitrary numbers function to describe the relative characteristics of goods within a product line when they are used in a progressive fashion. The Defendants note that the Plaintiff's catalogs shows just such a progression of Series 2000 model numbers, which describe each gauge's relative ranges of pressure. For example, under the heading "SERIES 2000 MAGNEHELIC® GAGE—MODELS AND RANGES," the Plaintiff lists numerous model numbers, such as the 2001, 2002, 2003, etc. The 2001 has a 0 to 1.0 range in inches of water; the 2002 has a range up to 2.0 inches; etc. Thus, these model numbers appear to serve to distinguish different gauges and their capabilities. Importantly, however, it is not these model numbers for which the Plaintiff has claimed a trademark. The claimed trademark is for *Series 2000*, and the Court finds that the Plaintiff's evidence regarding the selection and use of this phrase is sufficient to permit a jury to consider whether Series 2000 is a protectable trademark.

The Plaintiff claims that Series 2000 is protectable regardless of any secondary meaning that it has acquired because it is not descriptive. The Defendants have not presented sufficient evidence from which the Court can conclude as a matter of law that Series 2000 describes the features of the Plaintiff's differential pressure gauges, particularly in light of the Plaintiff's evidence that the term does not designate a size, aspect, or other characteristic of the Plaintiff's

differential pressure gauges and was arbitrarily selected. With this evidence, the Plaintiff appears to be asserting that Series 2000 is inherently distinct as an arbitrary mark. *See Two Pesos*, 505 U.S. at 768 (describing the different categories of marks). On the record currently before the Court, Series 2000 does not appear to be descriptive or connotative of the differential pressure gauge industry or to communicate any information about the product, either directly or by suggestion. A trier of fact could find that the term Series 2000 is arbitrary, and thus inherently distinct.

In addition, even if the record were sufficiently developed to conclude that series 2000 is descriptive, a triable issue of fact remains whether Series 2000 (as a descriptive mark) has acquired secondary meaning. The Plaintiff's evidence shows that it has had continuous and exclusive use of the mark in the United States since at least 1963 for differential pressure gauges, has predominantly displayed the mark in its advertising catalog since at least 1963, has sold over 4.3 million units, and has amassed more than $175 million in revenues for the years 2000 through 2010 for sales of gauges marketed under the Series 2000 mark. The Defendants note that this evidence is circumstantial and argue that, as such, it is insufficient to establish secondary meaning. Although the record regarding secondary meaning is somewhat sparse, it is adequate to create a genuine issue of material fact and stave off summary judgment. *See N.Y. State Elec. & Gas Corp. v. U.S. Gas & Elec., Inc.*, 697 F. Supp. 2d 415, 428 (W.D.N.Y. 2010) (noting that the existence of secondary meaning is an inherently factual inquiry that may present factual issues for resolution by a jury).

Genuine issues of material fact remain concerning the status of Series 2000 as a protectable mark. Based on the designated materials regarding the arbitrary nature of the mark

and its failure to communicate anything about the qualities of the product at issue, a reasonable fact finder could determine that Series 2000 is sufficiently distinct to warrant common law trademark protection. Based on the designated materials involving the Plaintiff's long term exclusive use, advertising, and sales involving Series 2000, a reasonable fact finder could determine that the Series 2000 designation in association with differential pressure gauges is protectable because customers and purchasers of differential pressure gauges have come to associate it with the Plaintiff. Accordingly, the Defendants are not entitled to judgment as a matter of law disposing of the Plaintiff's claims with respect to Series 2000.

### E.   Count VI—Common Law Unfair Competition

Count VI is a common law claim for unfair competition for use of the Plaintiff's registered marks and of the Series 2000 designation. The analysis under the Lanham Act for unfair competition also applies to claims for unfair competition under Indiana common law. *See Vision Ctr. Nw., Inc. v. Vision Value, LLC*, 673 F. Supp. 2d 679, 683 (N.D. Ind. 2009) (applying the same analysis to claims of unfair competition and trademark infringement under Indiana law as applied to Lanham Act claims because they all turned upon the same law and facts) (citing *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 428 (2003); *Ind. Cheer Elite, Inc. v. Champion Cheering Org., LLC*, No. 3:05–CV–125, 2005 WL 2219467, at *1 n.1 (N.D. Ind. Sept. 13, 2005); *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 (Ind. 2001)). The Defendants argue that the Court should enter summary judgment in its favor on Count VI for the same reasons that summary judgment is appropriate for Count IV, specifically that there is no likelihood of confusion in the comparative advertising.

Because the Defendants are relying on previous argument, and the analysis is the same, the Court also relies on its previous discussion with respect to the various uses of the Magnehelic® Mark and nominative fair use. The claim may proceed consistent with the findings set forth above. Likewise, the Defendants do not develop any argument with respect to the likelihood of confusion caused by their use of the Lens Mark, attempting instead to limit the time period for any damages. Thus, the Court's analysis pertaining to damages is also relevant to Count VI and the denial of summary judgment.

**F.      Count VIII—Copyright Infringement**

The Defendants argue that they are entitled to summary judgment on the Plaintiff's copyright claim because the Plaintiff cannot show the requisite causal relationship between the Defendants' use of the Plaintiff's copyrighted material for installation instructions, specifically the use of a substantially similar illustration, and the Defendants' profits. The Defendants argue that no such causal relationship exists because consumers did not have access to the installation manual (IOM), which was included in the product packaging, until after completing a purchase.

The Plaintiff disputes the Defendants' argument that the IOM was only available upon purchase, and designates evidence that the Defendants provided the IOM on Sensocon's website and communicated this availability to potential purchasers. They then argue,

> [w]ithout the inclusion of the [IOM] with the Sensocon gauges, the gauges would not be used or maintained in the proper manner. Use and maintenance of differential pressure gauges is not intuitive and, thus, the manual included with the Sensocon gauges is a necessary part of the sale of the Sensocon gauges. Consumers would likely not purchase the Sensocon gauges if no installation and maintenance manual was included therewith. All of Defendant's profits from the sale of the Sensocon gauges are therefore reasonably related to its infringement of Dwyer's copyright.

41

(Pl.'s Mem. 23, ECF No. 108.) In response, the Defendants argue that there is simply no evidence that the use of two simple line drawings caused the sale of a single gauge, and criticize the Plaintiff for asking the Court, absent such proof of a causal link, to consider the IOM as a whole and to further speculate that the IOM is connected to a buyer's purchasing decision.

In a copyright case, a plaintiff may recover his actual damages and any additional profits of the infringer. 17 U.S.C. § 504(b) (providing that a "copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages"). To establish an infringer's profits, "the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.*[6] The purpose of the award of the defendant's profits is "to prevent the infringer from unfairly benefiting from a wrongful act." *William A. Graham Co. v. Haughey*, 646 F.3d 138, 144–45 (3d Cir. 2011) (citing H.R. Rep. No. 94–1476, at 161, 1976 U.S.C.C.A.N. 5659, 5777 (1976)); *see also* 4 *Nimmer on Copyright* § 14.03 (same). As noted in Nimmer's treatise, "[m]uch of the heavy lifting in this domain inheres in sophisticated analysis of causation." *Id.* § 14.03. Particularly relevant to this case is whether any of the Defendants' profits were "attributable to the infringement." 17 U.S.C. § 504(b). On this matter, Nimmer notes:

_____

[6] Even where a plaintiff is not entitled to compensatory damages, he may still be able to obtain statutory damages. *See* 17 U.S.C. § 504(a); *id.* § 504(c)(1) (providing that "the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action"). However, the Defendants argue that, because the Plaintiff did not register its copyright until December 18, 2008, which was after the alleged infringement, the Plaintiff is statutorily precluded from obtaining an award of statutory damages or of attorney's fees under 17 U.S.C. § 412. The Plaintiff does not dispute this, and the parties appear to agree that the Plaintiff is seeking only the Defendants' profits.

When an infringer's profits are only remotely and speculatively attributable to the infringement, courts will deny recovery to the copyright owner. Analytically, an award should be denied in two distinct types of cases: (1) those in which there existed no conceivable connection between the infringement and a given revenue stream; and (2) those in which it is unclear how much, if anything, the defendant earned from the infringement. Those separate ingredients of remoteness and speculation tend to interact in actual cases.

4 *Nimmer on Copyright* § 14.03[b][2] (quotation marks, emphasis, and footnotes omitted).

The Defendants challenge the Plaintiff's damages for copyright infringement as speculative, and they may ultimately succeed. However, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Johnson v. Hix Wrecker Service, Inc.*, 651 F3d 658, 662 (7th Cir. 2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance.") (citing *Celotex Corp.*, 477 U.S. at 325–26;*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 42 (7th Cir. 1992)). Once the moving party has met that burden, the non-moving party must come forward and demonstrate that such an issue does, in fact, exist. *See Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Once a copyright owner establishes an infringer's gross revenues, "the burden shifts to the infringer to prove either that part or all of those revenues are 'deductible expenses' (i.e., are not profits), or that they are 'attributable to factors other than the copyrighted work.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 520 (4th Cir. 2003) (quoting *Konor Enters., Inc. v. Eagle Publ'ns, Inc.*, 878 F.2d 138, 140 (4th Cir. 1989)). It is important to note that the Defendants do not challenge any particular calculation of profits. Rather, the Defendants argue that the Plaintiff cannot establish a

connection between its inclusion of an illustration in its installation manual and the sale of the gauges to which the manual applied. However, argument is not evidence and the Defendants have not demonstrated that such a connection is absent and that Sensocon's revenues are not attributable to the infringement. *Cf. Bouchat*, 346 F.3d at 525 (stating that the defendants successfully carried their initial burden of demonstrating the absence of a genuine issue of material fact when they proffered affidavits showing that revenues were driven by factors unrelated to the infringing logo design).

The manual was available for viewing by customers considering whether to purchase a technical product that required adherence to specific installation and operating instructions, and Kohl explicitly invited potential customers to view the materials. Although the Plaintiff has not provided any evidence that the manual, including the illustration, was connected to any purchasing decisions, it was not required to because the Defendants have not presented any reliable evidence that purchasers did not view or consider the manual before deciding to purchase its product. The Defendants' argument that only one page of the manual included infringing material does not entitle it to summary judgment. "[A]n infringer who commingles infringing and noninfringing elements 'must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him.'" *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 567–68 (1985) (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 406 (1940)). Although an apportionment of profits will most likely be necessary if infringement is found (because much of the Defendants' profits would still likely be attributable to factors other than the infringement), the burden for such apportionment will be on the Defendants upon the Plaintiff's satisfactory proof of gross

revenues. On the current record, the Court cannot summarily rule on the copyright infringement claim and thereby dismiss it altogether.

**G.      Count IX Counterfeiting**

In Count IX of the First Amended Complaint, the Plaintiff alleges that the Defendants sold, offered for sale, imported, and distributed counterfeit Dwyer gauges bearing a plurality of horizontal lines and raised rectangular portion, a counterfeit to the Plaintiff's Lens Mark, in violation of 15 U.S.C. § 1114. In their Motion for Partial Summary Judgment, the Defendants assert that, even assuming liability, the Plaintiffs damages are limited to the period of time between January 14, 2009, and December 31, 2009. The Defendants' argument is a restatement of its assertions regarding lack of actual notice of the Plaintiff's Lens Mark and cessation of sales of the gauges with a plurality of horizontal lines and raised rectangular portion after the introduction of its Third Generation Lens.

A counterfeit is "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed." 15 U.S.C. § 1116(d). In May 2008, the Plaintiff began using the letter R enclosed in a circle on the lenses of its differential pressure gauges after having registered the mark with the USPTO. This provided constructive notice of the Plaintiff's rights. 15 U.S.C. § 1111; *WMS Gaming, Inc. v. WPC Prods., Ltd.*, 542 F.3d 601, 603 (7th Cir. 2008) (stating that registration provides nationwide constructive notice of a registrant's rights to the underlying marks). The Plaintiff argues that the Defendants also had knowledge that the Plaintiff asserted trademark rights in the Lens Mark through its January 8, 2007, cease and desist letter. The Plaintiff argues

that the Defendants' continued use, after notice through the letter, the circle R on its lenses, and the January 2009 Complaint, amounts to willful blindness that can support an award of treble damages under 35 U.S.C. § 1117(b).

With respect to the letter, the Defendants argue that it did not provide notice of the Lens Mark. A plain reading of the letter suggests otherwise. Although the design of the lens was not registered at the time the Plaintiff sent the letter, the letter advised the Defendants that the Plaintiff was the owner of trademark rights in the trade dress of its Magnehelic® pressure gauges as generally shown in an attached drawing, which showed a gauge with a plurality of horizontal lines covering the bottom portion of the lens and a raised rectangular portion. The letter alleged that the Sensocon S2000 differential pressure gauge incorporated the trade dress of the Plaintiff's Magnehelic® pressure gauge, violated the Plaintiff's trademark rights, and was likely to cause confusion, mistake, and deception of the purchasing public. The impact of this notice in connection with the registration mark and Complaint, as it relates to damages, is not an issue that the Court can resolve in favor of the Defendants on the current summary judgment record.

The Defendants also attack the Plaintiff's evidence of use of the circle R to provide constructive notice. The Defendants argue that the Plaintiff's evidence reflects that the Plaintiff began using the registration symbol ® "only for the MAGNEHELIC Mark, and not the Registered Lens Mark." (Defs.' Reply 5, ECF No. 118.) However, Budny's Declaration establishes that the Plaintiff obtained from its lens supplier a modification of the lens cavity molds, and that this modification included the letter R enclosed in a circle to indicate that the Lens Mark on the lens was a federally registered trademark. The Defendants do not offer evidence that disputes Budny's contentions. Although the Magnehelic name with the ® symbol

is visible through the clear lens, the designation of Maghehelic® as a registered trademark appears to have been included on the Plaintiff's lenses well before 2008—not simply as a result of changes made in 2008. The Defendants' argument that the Plaintiff has not provided notice of registration of its Lens Mark does not warrant judgment as a matter of law regarding the beginning date of any damages for the counterfeit claim.

With respect to the closing date for any damages, the Court concludes that it likewise is an issue better suited for resolution after a more complete development of the record and the resolution of remaining issues of fact.


## CONCLUSION

For the reasons stated above, Defendants Sensocon, Inc.'s and Tony E. Kohl's Motion for Partial Summary Judgment [ECF No. 103] is DENIED. The Court sets a telephonic status conference for July 12, 2012, at 3:00 PM. The Court will initiate the call.

SO ORDERED on June 5, 2012.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION